# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **KING RECORDS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.  3-00-0299** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Nixon** |
| **KENNETH R. BENNETT d/b/a** | ) | **Magistrate Judge Griffin** |
| **KRB MUSIC COMPANIES and** | ) | |
| **KRB MUSIC COMPANIES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff King Records, Inc. ("King" or "Plaintiff") filed a three-count Complaint against

Defendants Kenneth Bennett ("Bennett"), d/b/a KRB Music Companies and KRB Music

Companies, Inc. ("KRB," and together with Bennett, "Defendants") alleging, among other

things, copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 et seq. of

numerous re-recordings of popular songs.  Count I alleges the copyright infringement of a

musical composition entitled "Don't Fall Asleep at the Wheel."  Count II alleges copyright

infringement of twenty-one sound recordings.  Count III alleged the unlawful duplication of

forty noncopyrightable sound recordings protected under the common law, including claims of

unfair competition, conversion, and unjust enrichment, as well as violations of Tenn. Code. Ann.

§ 39-14-139 and the Lanham Act, 15 U.S.C. § 1125(a).

A bench trial was conducted between July 21, 2003, and July 25, 2003.[1]  At the start of trial, Plaintiff sought the dismissal without prejudice of the claims in Count III pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, to which Defendant objected requesting dismissal with prejudice.  (See Doc. No. 199, Trial Tr. I at 6, 28-29.)  The Court reserved ruling on Plaintiff's motion (Id. at 29), and no evidence was presented regarding the claims in Count III.  Each party submitted their proposed findings of fact and conclusions of law (Doc. Nos. 209, 210).

In addition to the ultimate issue, also pending before the Court are the parties' motions in limine and post-trial motions.  These are addressed in the contemporaneously filed Memorandum Order.  For the reasons set forth below, the Court **ENTERS JUDGMENT** in favor of Plaintiff and **AWARDS** Plaintiff $170,000.

## I.     MATERIAL FACTS

King is a Tennessee corporation with its principal place of business in Nashville, Tennessee at 1900 Elm Hill Pike.  Prior to September 21, 2001, King was known as Gusto Records, Inc. ("Gusto").  Gayron C. "Moe" Lytle ("Lytle") is the president and sole shareholder of King.  King is in the music industry and causes to be manufactured, sells and licenses music records.

Defendant KRB is an Indiana corporation with its principal place of business in Brentwood, Tennessee.  Defendant Bennett is KRB's president and sole owner.  KRB's primary

---

[1]  This case was previously assigned to Judge Echols.  Due to a criminal matter in Judge Echols' Court, this case was reassigned to the undersigned three days prior to trial.  (See Doc. No. 184.)

business is "rack jobbing," which entails placing display fixtures in retail stores and using service representatives to refurbish the inventory in those fixtures.  The business at issue in this case is KRB's "rack jobbing" of cassettes and compact discs at Big Lots, a retail store with approximately 1,300 outlets across the country.  KRB has been in business for seventeen years and has been the exclusive supplier of music products to Big Lots for most of those seventeen years.  Prior to the end of 2002, Big Lots was KRB's biggest customer.

### A.  COUNT I -- MUSICAL COMPOSITION "DON'T FALL ASLEEP AT THE WHEEL"

On January 5, 1982, John Riggs and Gary Lumpkin entered into an agreement transferring their rights in the musical composition "Don't Fall Asleep at the Wheel" to Power Play Music (Division of Gusto Records, Inc.) & Moe's Music, located at 1900 Elm Hill Pike, Nashville.[2]  In addition to the agreement, Messrs. Riggs and Lumpkin executed an agreement entitled "Transfer of Copyright" in which they transferred to Power Play Music (A Division of Gusto Records, Inc.) "all right, title and interest in and to the copyright and all exclusive rights comprised in the copyright, without limitation in the musical composition . . . Don't Fall Asleep at the Wheel."  (Pl. Ex. 6.)  Lytle testified that the original authors of the song created it for Gusto.

Ten years later, a musical composition copyright was registered with the United States Copyright Office ("Copyright Office") in the words and music of "Don't Fall Asleep at the Wheel," effective December 18, 1992.  The copyright claimant on the original registration is

---

[2]  A musical composition includes the music and lyrics written by the composer.  The copyright in a musical composition is governed by 17 U.S.C. § 106.

Case 3:00-cv-00299   Document 227   Filed 06/20/06   Page 3 of 99 PageID #: 48

Power Play Music, Inc., located at 1900 Elm Hill Pike in Nashville. There is no evidence in the record that a corporation entitled Power Play Music, Inc. existed in 1992. There is, however, evidence that a Tennessee corporation entitled Power Play Publishing Company was incorporated on April 11, 1988, and its charter was amended on October 10, 2001 to reflect a name change to Power Play Music, Inc. Lytle was the president and sole shareholder of Power Play Publishing Company, and continues to be the president and sole shareholder of Power Play Music, Inc.

Lytle testified that the copyright claimant should have been "Power Play Music (A Division of Gusto Records, Inc.)" and that the reference to "Power Play Music, Inc." on the registration was a mistake. In an attempt to correct the error on the registration, Lytle executed a series of assignments purporting to assign the copyright in "Don't Fall Asleep at the Wheel" to Gusto, which is now known as Plaintiff King. These assignments utterly fail to create any clarity; instead, riddled with error, they simply enhance the confusion surrounding the copyright claimant of "Don't Fall Asleep at the Wheel."

First, on April 7, 2000, Lytle executed an "Assignment of Copyright" in which GML, Inc. ("GML"), another company of which Lytle is the sole shareholder and an officer, purported to be the "sole owner" of the copyright registration of "Don't Fall Asleep at the Wheel." GML transferred its "rights" to Gusto even though there is no evidence that GML had any rights in "Don't Fall Asleep at the Wheel" to assign to Gusto. This assignment was signed by notary public Carolyn McMinn ("McMinn"). McMinn also completed a "Document Cover Sheet For Recordation of Documents United States Copyright Office." McMinn affirmed that the information she provided on the recordation cover sheet was "a true and correct representation of

-4-

the accompanying document." The recordation cover sheet, which was recorded with the Copyright Office on October 2, 2000, is not a true and correct representation of the assignment because it incorrectly explains that the assignment is from Power Play Music, Inc. to Gusto, whereas the assignment is actually from GML to Gusto.

Second, again on April 7, 2000, Lytle executed and McMinn notarized another "Assignment of Copyright" in which Power Play Music, Inc. purported to be the "sole owner" of the copyright registration of "Don't Fall Asleep at the Wheel," and assigned its "rights" to Gusto. There is no evidence that this assignment was recorded with the Copyright Office. There is also no evidence that a company by the name of Power Play Music, Inc. existed on April 7, 2000. This is underscored by the fact that this assignment does not include the standard language in the preamble regarding the state in which Power Play Music, Inc. is incorporated. There is evidence that such a company came into existence on October 10, 2001. As it stands, however, this assignment involves a non-existent company purporting to have rights in "Don't Fall Asleep at the Wheel," and attempting to assign those rights to Gusto.

Third, on April 16, 2001, Steven Kountzman ("Kountzman"), purported Vice President of Power Play, Inc., executed a third "Assignment of Copyright," which McMinn notarized. In this assignment, Power Play Music, Inc. (not Power Play, Inc.) purported to be the "sole owner" of the copyright registration of "Don't Fall Asleep at the Wheel," and assigned its "rights" to Gusto. There is no evidence that this assignment was recorded with the Copyright Office. There is also no evidence that a company by the name of Power Play, Inc. or Power Play Music, Inc. existed on April 16, 2001. This is underscored by the fact that this assignment does not include the standard language in the preamble regarding the state in which Power Play Music, Inc. or

-5-

Power Play, Inc. are incorporated. While there is evidence that Power Play Music, Inc. came into existence on October 10, 2001, there is no evidence that Power Play, Inc. ever existed or now exists. This assignment, therefore, involves two non-existent companies, one or both of which are claiming ownership in "Don't Fall Asleep at the Wheel," and attempting to assign their rights to Gusto.

To add to this confusion, Gusto (now known as Plaintiff King) acknowledged in response to Defendants' First Set of Interrogatories, that it was not the registered copyright owner of "Don't Fall Asleep at the Wheel" on August 18, 2000. It was not until June 20, 2003 that Plaintiff provided a supplemental response stating that it was the registered copyright owner of "Don't Fall Asleep at the Wheel." This response was apparently based on Plaintiff's incorrect belief that at least one of the three assignments described above involved the rightful owner of "Don't Fall Asleep at the Wheel" properly assigning its rights to Gusto.

### B. COUNT II – TWENTY-ONE SOUND RECORDINGS

Count II contains a claim of copyright infringement of twenty-one sound recordings.[3] The sound recordings are "re-recordings" of popular songs. That is, the artist of a particular

---

[3] Sound recordings are defined as "works that result from the fixation of a series of musical, spoken or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects such as discs, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101. "Thus, except with respect to a sound track integrated with an audiovisual work, a sound recording copyright may be claimed in the aggregate of sounds embodied in any tangible medium, including phonograph discs, open-reel tapes, cartridges, cassettes, player piano rolls, and other material objects in which sounds are fixed and can be communicated either directly or with the aid of a machine or device." 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 2.10 (2006) (hereinafter "Nimmer on Copyright"). The copyright in sound recordings is governed by 17 U.S.C. § 114.

song re-records the vocal track of his or her original song for a recording studio for a fee. In the late 1970s Lytle, on behalf of his company Gusto (now known as King), entered a series of contracts with Louis Lofredo ("Lofredo") of Mandala International ("Mandala") to re-record many of the songs in Count II. Lofredo entered into contracts with the individual artists whereby the artist agreed to record "master recordings" of certain of the artists' songs for Mandala. In exchange for a flat fee, the artists gave the rights in these master recordings to Mandala, including the right to copyright. In addition, the artists generally waived any rights to royalties resulting from the sale of phonograph records or cassette tapes derived from the master recordings. After obtaining such an agreement with an individual artist for particular songs, Mandala entered into an assignment agreement with Plaintiff whereby Plaintiff could "record or re-record master recordings embodying the Artist(s) performance." Mandala assigned all the rights it obtained from the artists to Plaintiff. Plaintiff also entered into similar agreements directly with certain other artists, without the assistance of Lofredo. Plaintiff then produced the master recording, with Lofredo's supervision and assistance, in the event Lofredo obtained the agreement with the artist. Production of the recording entailed hiring musicians to play the musical instruments, providing back-up vocals, studio time and sound engineers. Generally, the artist recorded the vocal tracks using the facilities, musicians and engineers provided by Plaintiff.

Michael S. Stone ("Stone") worked for Plaintiff as a recording engineer from 1976 to 1981, and was involved in the recording sessions of most of the sound recordings in Count II. He testified that each recording session was embodied on a multi-track tape. Each of these multi-track tapes contains sixteen separate tracks on which individual sounds can be recorded.

-7-

Thus, each track would contain the sounds from a particular instrument. This sixteen-track master recording was "mixed down" to a two-track master version. All finished products, such as cassette tapes or records were made from the two-track master.

Generally, these individual sound recordings, together with other sound recordings not at issue in this case, were released on phonorecords (hereinafter referred to as "albums").[4] In addition, the albums were registered with the Copyright Office for copyright protection. For the most part, the individual sound recordings were not registered separately with the Copyright Office or listed on the album's certificate of registration. Lytle submitted an affidavit stating that a "label copy" of each album was deposited with the Copyright Office. The "label copy" identifies each sound recording contained on the album.

### 1. "Venus in Blue Jeans"

On July 12, 1977, Lofredo, on behalf of Mandala, entered into an agreement with Jimmy Clanton to re-record "Venus in Blue Jeans," along with two other songs. In an undated agreement, Plaintiff agreed to pay Lofredo $1,300 for supervising the recording of "Venus in Blue Jeans," as well as additional sums for the other two songs. The agreement also shows that Lofredo agreed to assign his rights in the songs to Plaintiff. On July 21, 1977, Mandala assigned to Plaintiff in consideration for $3,900 all the rights it obtained from its agreement with Jimmy

---

[4] "'Phonorecords' are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'phonorecords' includes the material object in which the sounds are first fixed." 17 U.S.C. § 101.

-8-

Clanton in "Venus in Blue Jeans," as well as the other two songs. Plaintiff also agreed to pay for all production costs.

Stone testified that he was present during the recording session of "Venus in Blue Jeans," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on August 18, 1977 at Plaintiff's recording studio on 3557 Dickerson Road. Stone testified that he was the recording engineer for the recording session, and mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to Lofredo, to the artist for travel, to other musicians and of other costs.

This re-recording of "Venus In Blue Jeans" was released on an album entitled "Super Hits of the 60's . . Original Artists, Power Pak PO-309." The album cover includes a "personal" note from Lofredo to the consumer, and states that it was produced and directed by Lofredo. It also notes that it was distributed exclusively by Gusto. This album was registered with the Copyright Office as a sound recording entitled "Super Hits of the 60s . . Original Artists," with the catalogue number PO 309. The copyright registration is effective March 3, 1978, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

2.      *"Charlie Brown"*

On September 20, 1977, Lofredo, on behalf of Mandala, entered into an agreement with Billy Guy and Will "Dub" Jones a/k/a The Coasters to re-record "Charlie Brown," along with six other songs. On September 26, 1977, Plaintiff agreed to pay Lofredo $1,300 for supervising the

recording of "Charlie Brown," as well as additional sums for the other songs. The agreement also shows that Lofredo agreed to assign his rights in the songs to Plaintiff. On February 21, 1978, Mandala assigned to Plaintiff in consideration for $10,400 all the rights it obtained from its agreement with The Coasters in "Charlie Brown," as well as the other songs. Plaintiff also agreed to pay for all production costs related to the re-recording.

Stone testified that he was present during the recording session of "Charlie Brown," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on October 13, 1977 at Plaintiff's recording studio on 3557 Dickerson Road. Stone identified a photograph of the "two gentlemen in The Coasters" taken during the recording session. Stone testified that he was the recording engineer for the recording session, and mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to Lofredo, to the artist for travel, to other musicians and of other production costs.

This re-recording of "Charlie Brown," was released on the album "The Coasters Greatest Hits, Power Pak PO-310." The album cover includes a "personal" note from Lofredo to the consumer, and states that it was produced and directed by Lofredo. It also notes that it was distributed exclusively by Gusto. Stone is listed as the recording and remix engineer on the album cover. This album was registered with the Copyright Office as a sound recording entitled "The Coasters . . . Greatest Hits," with the catalogue number PO 310. The copyright registration is effective March 3, 1978, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

-10-

3. *"Mountain's High"*

On September 20, 1976, Dick St. John a/k/a Dick and Dee Dee entered a contract with

and S.J. Productions, Inc. ("S.J. Productions"), pursuant to which Dick St. John ("St. John") was

to be paid $637.50 for re-recording "The Mountain's High," and additional sums for other songs.

St. John formerly sang "The Mountain's High" in a duo with Mary Sperling a/k/a Dee Dee

Phelps, and the duo was known as Dick and Dee Dee. By 1976, the duo had parted ways and St.

John obtained express permission from Dee Dee Phelps to re-record "The Mountain's High" on

his own. This authorization is attached to the September 1976 contract between St. John and S.J.

Productions, which Dee Dee Phelps also executed.

St. John testified that after signing the first contract in 1976 nothing happened. He was

subsequently re-contacted, and on August 10, 1977, Lofredo, on behalf of Mandala, entered into

an agreement with St. John and his wife, Sandy St. John, to re-record "The Mountain's High"

and two other songs for $750 per song. St. John testified that he did not find it necessary to

obtain another authorization from Dee Dee Phelps to enter this August 1977 agreement because

he had already received her authorization to re-record "The Mountain's High." In an undated

agreement, Plaintiff agreed to pay Lofredo $1,300 for supervising the recording of "The

Mountain's High," as well as additional sums for the other songs. The agreement also shows

that Lofredo agreed to assign his rights in the songs to Plaintiff. In an undated agreement,

Mandala assigned to Plaintiff in consideration for $3,900 all the rights it obtained from its

August 1977 agreement with St. John in "The Mountain's High," as well as the other songs.

Plaintiff also agreed to pay for all production costs related to the re-recording.

-11-

Stone testified that he was present during the recording session of the music of "The Mountain's High," and at trial recognized the tape box for the master recording and the track sheets showing that the music was recorded on March 17, 1978 at Plaintiff's recording studio on 3557 Dickerson Road. Stone testified that he was the recording engineer for that recording session, and mixed the sixteen-track master to the two-track master. Stone, however, was not the vocal engineer, as the lyrics were recorded by St. John and his wife Sandy St. John in California. St. John confirmed that the music "tracks were cut" in Nashville and that he and his wife "did the vocals in a studio on Ventura Boulevard in North Hollywood." St. John stated that he was paid $750 per song. St. John could not recall whether he was paid pursuant to the first, September 1976 agreement or the second, August 1977 agreement. It appears that he was paid pursuant to the second, August 1977 agreement, as it required St. John to receive $750 per song, whereas the September 1976 agreement only required payment of $637.50, which St. John did not recall receiving. Plaintiff provided evidence of payment to the other musicians, but did not produce evidence of payment to Lofredo or payment of other production costs.

This re-recording of "The Mountain's High" was released on the album "1961 Original Artists Super Hits, GT-0029." The album cover states that it was produced and directed by Lofredo, and engineered by Stone. It also notes that it was distributed exclusively by Gusto. This album was registered with the Copyright Office as a sound recording entitled "Super Hits 1961--Original Artists," with the catalogue number GT-0029. The copyright registration is effective October 12, 1979, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

-12-

*4.      "Fraulein"*

On February 20, 1974, Tommy Hill, as President of Gusto, entered into an agreement with Bobby Helms ("Helms") to purchase the master recording in "Fraulein," along with several other songs, for a total of $2,500. Track sheets were admitted into evidence showing that "Fraulein" was recorded on February 22, 1974 at Monument Recording Studios, Inc. Tommy Hill is listed as the producer. Plaintiff also submitted a contract with American Federation of Musicians listing the musicians involved in the recording on February 22, 1974, as well as the amounts they were paid. This recording of "Fraulein" was released on a disk along with "You Are My Special Angel." This disk was registered with the Copyright Office as a sound recording entitled "You Are My Special Angel b/w Fraulein. GG 808." The copyright registration is effective August 16, 1977, and Plaintiff is the author and copyright claimant.


*5.-7.     "Gone," "Wings of a Dove," and "Fallen Star"*

On February 22, 1977, Tommy Hill, as President of Gusto, entered into an agreement with Ferlin Husky ("Husky"). Husky, in consideration for $8,000, assigned to Gusto his "worldwide right, titles and interest for all fields of use now known and hereafter existing in" several Husky recordings, including "Gone," "Wings of a Dove," and "Fallen Star."

Stone testified that he was present during the recording session for these three songs, and at trial recognized the tape box for the master recording and the track sheets showing that they were recorded on February 22, 1977. Stone testified that he was the recording and vocals engineer, and he mixed the sixteen-track master to the two-track master. Plaintiff also submitted

-13-

a contract with American Federation of Musicians listing the musicians involved in the recording on February 22, 1977, as well as the amounts they were paid.

These three recordings were released on the album "Greatest Hits of Ferlin Husky, SD-3018." The album cover states that it was distributed exclusively by Gusto. This album was registered with the Copyright Office as a sound recording entitled "Favorites of Ferlin Husky," with the catalogue number SD-3018. The copyright registration is effective July 11, 1978, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

8.  *"Bottle of Wine"*

On July 11, 1977, Lofredo, on behalf of Mandala, entered into an agreement with Jimmy Gilmer to re-record "Bottle of Wine," along with another song. On July 15, 1977, Plaintiff agreed to pay Lofredo $1,300 for supervising the recording of "Bottle of Wine," as well as additional sums for the other song. The agreement also shows that Lofredo agreed to assign his rights in the songs to Plaintiff. On July 19, 1977, Mandala assigned to Plaintiff in consideration for $2,600 all the rights it obtained from its agreement with Jimmy Gilmer in "Bottle of Wine," as well as the other song. Plaintiff also agreed to pay for all production costs related to the re-recording.

Stone testified that he was present during the recording session of "Bottle of Wine," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on July 20, 1977 at Plaintiff's recording studio on 3557 Dickerson Road. Stone

-14-

identified a photograph of Jimmy Gilmer taken during the recording session. Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to Lofredo, to other musicians and of other production costs.

This re-recording of "Bottle of Wine," was released on the album "1967 Original Artists Super Hits, GT-0035." The album cover states that it was produced and directed by Lofredo and engineered by Stone. It also notes that it was distributed by Gusto. This album was registered with the Copyright Office as a sound recording entitled "Super Hits 1967--Original Artists," with the catalogue number GT-0035. The copyright registration is effective October 12, 1979, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

9. *"Patches"*

On January 7, 1980, Plaintiff entered into an agreement with Clarence Carter to re-record "Patches," along with two other songs. Stone testified that he was present during the recording session of "Patches," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on January 17, 1980 at Plaintiff's recording studio on 3557 Dickerson Road. Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to the musicians and of other production costs.

-15-

This re-recording of "Patches" was released on the album "70s Gold, GT-0078." The album cover states that the executive producer was Lytle, the producer was Lofredo and the engineer was Stone. It also notes that it was distributed by Gusto. This album was registered with the Copyright Office as a sound recording entitled "70's Gold," with the catalogue number GT-0078. The copyright registration is effective August 27, 1981, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

10.    *"When a Man Loves a Woman"*

On November 8, 1979, Plaintiff entered into an agreement with Percy Sledge to re-record "When a Man Loves a Woman," along with several other songs. Stone testified that he was present during the recording session of "When a Man Loves a Woman," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on November 20, 1979 at Plaintiff's recording studio on 3557 Dickerson Road. Stone identified a photograph of Percy Sledge taken during the recording session. Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to Percy Sledge for $6,000 pursuant to the agreement, to the musicians and of other production costs.

This re-recording of "When a Man Loves a Woman" was released on the album "Percy Sledge -- Greatest Hits, GT-0070." The album cover states that Lytle was the executive producer and Stone was the engineer. It also notes that it was distributed by Gusto. This album

-16-

was registered with the Copyright Office as a sound recording entitled "Percy Sledge -- Greatest Hits," with the catalogue number GT-0070. The copyright registration is effective August 17, 1981, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

*11.     "Ain't Got No Home"*

On May 2, 1978, Lofredo, on behalf of Mandala, entered into an agreement with Clarence "Frogman" Henry to re-record "Ain't Got No Home." On May 18, 1978, Mandala assigned to Plaintiff in consideration for $5,200 all the rights it obtained from its agreement with Clarence "Frogman" Henry in "Ain't Got No Home," as well as the other songs. Plaintiff also agreed to pay for all production costs related to the re-recording.

Stone testified that he was present during the recording session of "Ain't Got No Home," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on August 10, 1978 at Plaintiff's recording studio on 3557 Dickerson Road. Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to Lofredo, to other musicians and of other production costs.

This re-recording of "Ain't Got No Home" was released on the album "1956 Super Hits Original Artists, GT-0024." The album cover states that it was produced and directed by Lofredo and engineered by Stone. It also notes that it was distributed by Gusto. This album was registered with the Copyright Office as a sound recording entitled "Super Hits 1956--Original

-17-

Artists," with the catalogue number GT-0024. The copyright registration is effective October 12, 1979, and Plaintiff is listed as the author and copyright claimant. Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

### 12.-15. "My Guy," "The One Who Really Loves You," "You Beat Me to the Punch," and "Two Lovers"

On September 18, 1976, Lofredo, on behalf of Mandala, entered into an agreement with Mary Wells to re-record "My Guy," "The One Who Really Loves You," "You Beat Me to the Punch," and "Two Lovers." In an undated agreement, Plaintiff agreed to pay Lofredo $5,200 for supervising the recording of these four songs. The agreement also shows that Lofredo agreed to assign his rights in the songs to Plaintiff. On August 8, 1977, Mandala assigned to Plaintiff in consideration for $5,200 all the rights it obtained from its agreement with Mary Wells in these four songs Plaintiff also agreed to pay for all production costs related to the re-recording.

Stone testified that he was present during the recording sessions of these four songs. Stone identified photographs of Mary Wells taken during the recording session. Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master for all four songs. Plaintiff also provided evidence of payment to Lofredo, of travel costs to Mary Wells, to other musicians and of other production costs.

These four re-recordings were released on the album "Dobie Gray and Mary Wells--Greatest Hits, PO-313." The album cover states that it was produced and directed by Lofredo and that Stone was the recording and remix engineer. Lofredo also included a personal note on the album cover stating: "personal thanks to Mr. Moe Lytle . . . . The following talented

-18-

ingredients helped make this album possible: . . . Mike Stone -- Mixer . . . ."  It also notes that it was distributed exclusively by Gusto.  This album was registered with the Copyright Office as a sound recording entitled "Dobie Gray and Mary Wells . . Greatest Hits," with the catalogue number PO 313.  The copyright registration is effective July 11, 1978, and Plaintiff is listed as the author and copyright claimant.  Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

16.     *"Family Bible"*

On February 15, 1977, Tommy Hill, on behalf of Gusto, entered into an agreement with Claude Gray to purchase the master recording in "Family Bible," along with several other songs.  Plaintiff agreed to pay Gray $1,680.  Stone testified that he was present during the recording session of "Family Bible," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on February 14, 1977.  Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master.

This re-recording of "Family Bible" was released on the album "Country Gospel, GT-0069."  The album cover states that it was recorded at Gusto Studios and Lytle was the executive producer, while Stone was the engineer and remixer.  This album was registered with the Copyright Office as a sound recording entitled "Country Gospel," with the catalogue number GT-0069.  The copyright registration is effective August 17, 1981, and Plaintiff is listed as the author and copyright claimant.  Although the individual sound recordings on the album are not

-19-

listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

17.    *"Magnificent Sanctuary Band"*

On April 13, 1978, Plaintiff entered into an agreement with Dorsey Burnette to re-record "Magnificent Sanctuary Band," along with several other songs.  Stone testified that he was present during the recording session of "Magnificent Sanctuary Band," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded on April 11, 1978 at Plaintiff's recording studio on 3557 Dickerson Road.  Stone identified a photograph of Dorsey Burnette taken during the recording session.  Stone testified that he was the recording engineer for the recording session and he mixed the sixteen-track master to the two-track master.  Plaintiff also provided evidence of payment to Dorsey Burnette for $5,200 pursuant to the agreement, to the musicians and of other production costs.

This re-recording of "Magnificent Sanctuary Band" was released on the album "The Golden Hits of Dorsey Burnette, GT-0050."  The album cover states that Lytle was the executive producer and Stone was an engineer.  It also notes that it was distributed by Gusto.  This album was registered with the Copyright Office as a sound recording entitled "The Golden Hits of Dorsey Burnette," with the catalogue number GT-0050.  The copyright registration is effective September 24, 1979, and Plaintiff is listed as the author and copyright claimant.  Although the individual sound recordings on the album are not listed on the certificate of registration, they were listed on a label copy of the album deposited with the Copyright Office.

-20-

18.     *"Amazing Grace"*

On March 23, 1977, Plaintiff entered into an agreement with Charles David Houston ("Houston") to record certain master recordings specifically for Plaintiff. Houston was to record master recordings for four two-sided singles during the first year of the contract, and the parties could agree to extend the agreement for additional master recordings. Plaintiff obtained the right to copyright such recordings. Plaintiff agreed to pay Houston royalties after the recording, as well as an advance royalty of $30,000.

Pursuant to this agreement Houston recorded "Amazing Grace" for Plaintiff. Stone identified a photograph of Houston taken during the recording session. Stone testified that he was present during the recording session of "Amazing Grace," and at trial recognized the tape box for the master recording and the track sheets showing that it was recorded in May 1977 at Plaintiff's recording studio on 3557 Dickerson Road. Stone testified that he was the recording engineer for the recording session and he mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of partial payment of the advance royalty to Houston in the amount of $15,000 pursuant to the agreement, as well as payment to the musicians and of other production costs.

This recording of "Amazing Grace," was released on a disk entitled "Amazing Grace, SD 161." The label states that it was distributed by Gusto. "Amazing Grace" was registered with the Copyright Office as a sound recording, along with "Return to Me." The copyright registration was filed July 8, 1977, and Plaintiff is listed as the author and the copyright claimant.

*19.    "Keep Searchin'"*

On July 21, 1977, Lofredo, on behalf of Mandala, entered into an agreement with Del
Shannon to re-record "Keep Searchin'," along with other songs.  In an undated agreement,
Plaintiff agreed to pay Lofredo $1,300 for supervising the recording of "Keep Searchin'," as well
as additional sums for the other songs.  The agreement also shows that Lofredo agreed to assign
his rights in the songs to Plaintiff.  On November 21, 1977, Mandala assigned to Plaintiff in
consideration for $5,200 all the rights it obtained from its agreement with Del Shannon in "Keep
Searchin'," as well as the other songs.  Plaintiff also agreed to pay for all production costs
related to the re-recording.

Stone testified that he was present during the recording of the music of "Keep Searchin',"
but he was not present for the recording of Del Shannon's vocal tracks.  Stone testified that the
master tape was sent to California for the vocal track to be completed, and when they were
returned, they contained the vocal tracks.  Stone testified that he was the recording engineer for
the music track and he mixed the sixteen-track master to the two-track master.  Plaintiff also
provided evidence of payment to Lofredo, to other musicians and of other production costs.

This re-recording of "Keep Searchin'" was released on the cassette tape "20 Greatest Hits
1963 Original Artists, DLX 7804."  The cassette does not identify Plaintiff as the producer or
distributor, but Lytle testified that the cassette was made by a third party from Plaintiff's master
recording.  This cassette tape was registered with the Copyright Office as a compilation of sound
recordings entitled "20 Greatest Hits 1963 Original Artists," with the catalogue number DLX

7804.[5]  The copyright registration is effective October 1, 1991, and Gusto is listed as the author

and GML is listed as the copyright claimant.  Although the individual sound recordings on the

cassette tape are not listed on the certificate of registration, they were listed on a label copy of

the tape deposited with the Copyright Office.  On April 7, 2000, GML assigned to Gusto its

rights, including the copyright registration, in "Keep Searchin'."  This assignment was recorded

with the Copyright Office on October 2, 2000.


      20.      *"Take This Job and Shove It"*

On November 28, 1982, Plaintiff entered into an agreement with Johnny Paycheck to re-

record "Take this Job and Shove It," along with nine other songs.  Plaintiff agreed to pay Johnny

Paycheck an advance of $10,000 for the master recording of each song, and a royalty of one cent

per song sold thereafter.  Track sheets and photographs of the recording session were admitted

into evidence showing that "Take this Job and Shove It" was recorded at Plaintiff's recording

studio on 3557 Dickerson Road.  Stone, although not involved in the recording, identified and

authenticated the master tapes containing "Take this Job and Shove It," as tapes held in

Plaintiff's vault in the regular course of business.

This re-recording of "Take this Job and Shove It" was released on the album "Johnny

Paycheck--Golden Classics, GT-0098."  The album cover states that Lytle was the executive

---

    [5]  Plaintiff was unable to submit an original copyright registration certificate for Del
Shannon's "Keep Searchin'."  The parties, however, stipulated to the authenticity and
admissibility of a photocopy of the certificate of registration.  A photocopy of the certified
registration is admissible for the same purpose as the certified registration.  See Broadcast
Music, Inc. v. 3-B, Inc., No. 95-cv-70499-DT, 1996 U.S. Dist. LEXIS 5679, at *6 (E.D. Mich.
Jan. 16, 1996).

producer.  It also notes that it was distributed by Gusto.  This album was registered with the

Copyright Office as a sound recording entitled "Johnny Paycheck--Golden Classics," with the

catalogue number GT-0098.  The copyright registration is effective October 22, 1990, and Gusto

is listed as the author and GML is listed as the copyright claimant.  The individual sound

recordings on the album, including "Take this Job and Shove It," are listed on the certificate of

registration.  On April 7, 2000, GML assigned to Gusto its rights, including the copyright

registration, in "Take this Job and Shove It."  This assignment was recorded with the Copyright

Office on October 2, 2000.


    21.      *"Good Morning Starshine"*

On July 11, 1977, Lofredo, on behalf of Mandala, entered into an agreement with Oliver

a/k/a/ William Swafford to re-record "Good Morning Starshine."  In an undated agreement,

Plaintiff agreed to pay Lofredo $1,300 for supervising the recording of "Good Morning

Starshine," as well as additional sums for the other songs.  The agreement also shows that

Lofredo agreed to assign his rights in "Good Morning Starshine" to Plaintiff.  On February 21,

1978, Mandala assigned to Plaintiff in consideration for $2,600 all the rights it obtained from its

agreement with Oliver in "Good Morning Starshine."  Plaintiff also agreed to pay for all

production costs related to the recording.

Stone testified that he was present during the recording session of "Good Morning

Starshine," and at trial recognized the tape box for the master recording and the track sheets

showing that it was recorded on November 28, 1977 at Plaintiff's recording studio on 3557

Dickerson Road in Nashville.  Stone identified a photograph of Oliver at Plaintiff's recording

studio. Stone testified that he was the recording and vocal engineer, and he mixed the sixteen-track master to the two-track master. Plaintiff also provided evidence of payment to Lofredo, to other musicians and of other production costs.

This re-recording of "Good Morning Starshine" was released on the cassette tape "20 Greatest Hits 1970 Original Artists, DLX 7875." The cassette does not identify Plaintiff as the producer or distributor, but Lytle testified that the cassette was made by a third party from Plaintiff's master recording. This cassette tape was registered with the Copyright Office as a compilation of sound recordings entitled "20 Greatest Hits 1970 Original Artists," with the catalogue number DLX 7875. The copyright registration is effective October 1, 1990, and Gusto is listed as the author and GML is listed as the copyright claimant. The individual songs on the cassette tape, including "Good Morning Starshine," are listed on the certificate of registration. On April 7, 2000, GML assigned to Gusto its rights, including the copyright registration, in "Good Morning Starshine." This assignment was recorded with the Copyright Office on October 2, 2000.


C.    K-TEL CONTRACTS

In the late 1970s, another Tennessee based company, S.J. Productions was also in the music recording business. Lofredo, who had solicited artists for Plaintiff, was instrumental in soliciting artists to re-record songs for S.J. Productions. As a result, S.J. Productions entered into separate agreements to re-record eighteen of the twenty-one titles that are at issue in Count II. S.J. Productions was in a joint venture with K-Tel Records ("K-Tel"). After entering into the agreements with the artists, S.J. Productions assigned the agreements to K-Tel. The K-Tel/S.J.

-25-

Productions joint venture produced master recordings pursuant to these agreements at its recording studio, Audio Media Recorders, Inc. ("Audio Media") on 19th Avenue South in Nashville. Stone, who worked for Plaintiff as a recording engineer from 1976 to 1981, was employed by the K-Tel/S.J. Productions joint venture from 1974 to 1976. Stone may have been the recording engineer for certain of the recordings sessions at Audio Media.[6] K-Tel has agreements and track sheets showing recording sessions for eighteen of the twenty-one sound recordings that are at issue in Count II. These agreements and recording sessions are as follows:

- Agreement dated November 15, 1975 between S.J. Productions and Jimmy Clanton to record a master recording of "Venus in Blue Jeans."

  - Recorded on October 31, 1975 at Audio Media.

- Agreement dated September 20, 1976 between S.J. Productions and St. John to record a master recording of "The Mountain's High."

  - Recorded on September 17, 1976 at Audio Media.

- Agreement dated June 5, 1976 between S.J. Productions and Bobby Helms to record a master recording of "Fraulein."

  - Recorded on June 17, 1976 at Audio Media.

- Agreements dated December 18, 1975 and August 7, 1976 between S.J. Productions and Ferlin Husky to record master recordings of "Fallen Star," "Gone," and Wings of a Dove."

  - "Wings of a Dove" recorded on June 17, 1976 at Audio Media. No record of recording of "Fallen Star" or "Gone."

---

[6] In particular, the recording sheets for the June 17, 1976 recordings sessions of "Family Bible," "Wings of a Dove," and "Fraulein" at Audio Media bear a signature that appears to spell out "M. Stone."

- Agreement executed in 1975 between S.J. Productions and Jimmy Gilmer to record a master recording of "Bottle of Wine."[7]

  - Recorded on October 31, 1975 at Audio Media.

- Agreement dated August 28, 1978 between S.J. Productions and Clarence Carter to record a master recording of "Patches."

  - Recorded at Audio Media; date of recording unknown.

- Agreement dated July 16, 1979 between S.J. Productions and Percy Sledge to record a master recording of "When a Man Loves a Woman."

  - Recorded on August 10, 1979 at Audio Media.

- Agreement dated May 20, 1977 between S.J. Productions and Clarence "Frogman" Henry to record a master recording of "Ain't Got No Home."

  - Recorded on May 19, 1977 at Audio Media.

- Agreements dated January 15, 1976 and September 21, 1976 between S.J. Productions and Mary Wells to record master recordings of "My Guy," "Two Lovers," "The One Who Really Loves You," and "You Beat Me to The Punch."

  - "My Guy" and "You Beat Me to The Punch" recorded on January 30, 1976 at Audio Media.

  - "Two Lovers" and "The One Who Really Loves You" recorded on September 17, 1976 at Audio Media.

- Agreement dated June 7, 1976 between S.J. Productions and Claude Gray to record a master recording of "Family Bible;"

  - Recorded on June 17, 1976 at Audio Media.

- Agreement dated August 3, 1976 between S.J. Productions and Del Shannon to record a master recording of "Keep Searchin';"

  - Recorded at Audio Media; date of recording unknown.

---

[7] The exact date of this agreement is illegible on the copy provided to the Court.

- Agreement dated December 22, 1982 between S.J. Productions and Johnny Paycheck to record a master recording of "Take This Job and Shove It," along with fifteen other songs.

  - Recorded on December 22, 1982 at Audio Media.

- Agreement dated June 16, 1976 between S.J. Productions and Oliver to record a master recording of "Good Morning Starshine."

  - Recorded on July 28, 1976 at Audio Media.

Notwithstanding the Lofredo-Stone connection, a review of the agreements and track sheets described above demonstrates that, with the exception of "Fraulein," certain of Mary Wells' songs, and "Take This Job and Shove It," the K-Tel/S.J. Productions artist agreements were executed before Plaintiff entered into its artist agreements. The K-Tel/S.J. Productions agreements were non-exclusive, included payment terms and songs that were not in Plaintiff's agreements. Therefore, there appear to be two separate master recordings, one by K-Tel and the other by Plaintiff, for eighteen of the twenty-one sound recordings in Count II.


D.    KRB'S PURCHASE OF THE TITLES IN COUNT I AND II

Turning now to Defendant KRB's purchase of twenty-one sound recordings and the musical composition (hereinafter referred to collectively as the "Titles"). KRB has two methods of obtaining the music product it sells: (1) third parties manufacture product to be sold under the KRB label; or (2) KRB purchases cassettes and compact discs from third parties and sells that finished product under whatever label the third party puts on it. KRB obtained the songs at issue in Count I and Count II through both these methods.

On January 11, 1995, KRB entered into a license agreement with Peachtree Music, Inc. ("Peachtree"). Jim Horner ("Horner") was the principal of Peachtree. Peachtree represented that

it owned and controlled hundreds of audio recordings by popular artists in the form of "records."[8]  These records and the audio recordings contained therein were listed in Schedule A of the agreement.  Schedule A is 143 pages long and includes two parts.  The first part includes a photocopy of the record "cover" with an image or photo of the artist(s) and a list of the songs on the record.  The second part is a list of the audio recordings per artist, which were being conveyed.  According to Plaintiff, Schedule A lists approximately 9,000 audio recordings.

Pursuant to the agreement, Peachtree granted KRB the nonexclusive license to reproduce, manufacture and sell the audio recordings in the form of records.  The term of the licensing agreement was for twenty-five years, ending on December 31, 2020.  In addition, KRB also purchased the masters of three audio recordings.  KRB had the exclusive right to reproduce and distribute these three audio recordings.  The purchase price of the agreement was $50,000.  Peachtree warranted that it owned the full and unrestricted right to license the audio recordings to KRB.

The agreement disclosed two lawsuits in which Horner was involved.  One of the lawsuits was initiated in Federal Court in the Middle District of Tennessee, Civil Action No. 3-92-0431 by Gusto against Classic Sound, Inc. ("Classic Sound"), another of Horner's companies, Horner, and several other companies (the "Classic Sound Lawsuit").  Notwithstanding the disclosure of this lawsuit, the agreement included the following clause: "2.6 Claims or Legal Actions.  No claims or legal actions exist with respect to the rights of [Peachtree] . . . to sublicense the [audio recordings] . . . to [KRB] . . . in accordance with the terms of this

---

[8]  Records were defined as any disc, tape or other device containing the audio recordings and intended for sale.

Agreement." Finally, the agreement provided that KRB was "responsible for the reporting of reproduction of the audio recordings and payment of resulting mechanical license fees and royalties . . . ."

KRB obtained the exclusive right to reproduce and sell the one musical composition in Count I and two sound recordings in Count II through the license agreement with Peachtree. The songs sold on KRB's own label were manufactured by Classic Sound. Thus, KRB purchased, manufactured and sold on its own product label:

(1) "Don't Fall Asleep at the Wheel" by Husky, sold on a cassette entitled Truck Drivin' Son of a Gun, Product No. KRB 5037;

(2) "Patches" by Clarence Carter, sold on a cassette entitled Spotlight Soul 1, Product No. KRB 5135; and

(3) "When a Man Loves a Woman" by Percy Sledge, sold on a cassette entitled Spotlight Soul 2, Product No. KRB 5136.[9]

_____

[9] In addition, KRB obtained from the Peachtree Agreement the right to reproduce and sell the compact disc entitled "Mary Wells. My Guy." This compact disc contained several songs by Mary Wells, including her songs that are involved in Count II, "My Guy," "The One Who Really Loves You," "Two Lovers," and "You Beat Me to the Punch." There is no evidence, however, that KRB sold this particular compact disc. There is evidence that KRB sold a cassette on its own label entitled Spotlight Soul 2, (KRB 5136), which contained Mary Wells' "The One Who Really Loves You." Similarly, KRB sold a cassette on its own label entitled Spotlight Soul 1 (KRB 5135) that contained Mary Wells' "My Guy." Plaintiff, however, has not included the Mary Wells' songs contained on these cassettes in its copyright infringement claim. Instead, Plaintiff is only claiming copyright infringement of Mary Wells' "My Guy," "The One Who Really Loves You," "Two Lovers," and "You Beat Me to the Punch," that are on the cassette entitled "Mary Wells -- My Guy" that KRB obtained from another company, Golden Circle. Further, Plaintiff contends that KRB obtained from Peachtree the license to Johnny Paycheck's "Take this Job and Shove It." However, Schedule A of the agreement does not include any reference to Johnny Paycheck's songs.

-30-

A significant aspect of KRB's business is buying and selling finished goods called "closeouts" from third parties. KRB obtained the rights to the remaining nineteen sound recordings in Count II through closeout purchases from Creative Sounds, Ltd. ("Creative Sounds") a company run by John LaMonte ("LaMonte"); Red Dog Express, Inc. ("Red Dog Express") a company run by Marshall Sehorn ("Sehorn") that also did business with Creative Sounds; and Golden Circle, a company that went out of business in approximately 1993. No documentation evidencing any agreements between KRB and these companies was presented at trial.

KRB obtained the following five sound recordings at issue in Count II from Red Dog Express and Creative Sounds:

(1)     "Keep Searchin'" by Del Shannon, sold on a cassette entitled Rock and Roll, Hall of Fame, Volume VIII, Product No. 1008;

(2)     "Bottle of Wine" by Jimmy Gilmer, sold on a cassette entitled Endless Summer, Vol. II, Product No. 1121;

(3)     "Ain't Got No Home" by Clarence "Frogman" Henry, sold on a cassette entitled Good Bye Vietnam, Vol II, Product No. 3601;

(4)     "The Mountain's High" by Dick & Dee Dee, sold on a cassette entitled Dirty Dancing, Vol I., Product No. 3610; and

(5)     "Charlie Brown" by The Coasters, sold on a cassette entitled More Dirty Dancing, Vol I., Product No. 3612.

KRB obtained the following nine sound recordings at issue in Count II from Creative Sounds:

-31-

(1)     "Good Morning Starshine" by Oliver, sold on a cassette entitled Groovin'
Greats/Hits of the 60's, Vol I., Product No. CSI-520-4;

(2)-(3) "Amazing Grace" by David Houston and "Magnificent Sanctuary Band" by
Dorsey Burnette, sold on a cassette entitled Classic Southern Gospel, Gospel Classics, Vol. 4,
Product No. SSI 154;

(4)     "Family Bible" by Claude Gray, sold on a cassette entitled Classic Southern
Gospel, Gospel Classics, Vol. 5, Product No. SSI 155;

(5)-(6) "Fraulein" by Bobby Helms and "Gone" by Ferlin Husky, sold on a cassette
entitled Country Stars: Original Artists, Vol. 2, Product No. SSI 3516;

(7)     "Wings of a Dove" by Ferlin Husky, sold on cassettes entitled Country Stars:
Original Artists, Vol 5; Classic Southern Gospel, Original Artists, Vol I; and Country Stars, Vol.
4, bearing Product Nos. SSI 3519, SSI 151, and CSI 518, respectively;

(8)     "Fallen Star" by Ferlin Husky, sold on a cassette entitled Country Stars: Original
Artists, Vol. 8, Product No. SSI 3522; and

(9)     "Venus In Blue Jeans" by Jimmy Clanton, on a cassette entitled Solid Gold Hits,
Vol. VI, Product No. CSL 1006.

KRB obtained the following five sound recordings at issue in Count II from Golden
Circle:

(1)     "Take This Job and Shove It" by Johnny Paycheck, on cassettes entitled Johnny
Pay Check, Take this Job and Shove It, and 16 Country Classics, bearing Product Nos. GK47549
and KRD 4818 respectively;

(2)-(5) "The One Who Really Loves You," "My Guy," "You Beat Me To The Punch," and "Two Lovers" by Mary Wells, on a cassette entitled Mary Wells -- My Guy, Product No. GK 57722.

### E.  KRB'S SALE TO BIG LOTS OF THE TITLES IN COUNT I AND II

KRB supplied all the Titles to Big Lots.  Lytle stated that he purchased several cassettes containing all of the Titles at issue from various Big Lots stores in December 1997, January 1998, and February 1998.  Notwithstanding the fact that Lytle purchased several cassettes containing all of the Titles, Defendants contend that they have no record of buying or selling eleven of the sound recordings in Count II.  Defendants provide three alternative explanations for how Lytle could have purchased products containing the sound recordings at issue in Count II, even though Defendants have no record of purchasing or selling them.  First, Defendants contend that it is possible that KRB received de minimis amounts of these sound recordings due to mistake by the seller.  Second, KRB may have purchased small amounts of pre-packs or closeout purchases containing these sound recordings.  The individual sound recordings from such purchases would not be reflected in KRB's accounting system.  Instead, the individual sound recordings would be placed in a mixed category.  Third, Defendants maintain that due to Big Lots' flexible return policy, certain cassettes containing the sound recordings at issue may have been returned to Big Lots and placed on KRB's rack even though KRB had not sold the product to Big Lots.

In 2002, Big Lots decided to stop selling cassettes and returned approximately 800,000 cassettes to KRB.  These cassettes were shipped from approximately 1,300 different retail stores

across the country to Level Two, a warehouse rented by KRB. Pursuant to a Court order, Plaintiff was granted the right over a sixty-day period to inspect all of the cassettes at the warehouse. During this inspection, Plaintiff found small quantities of six of the sound recordings that Defendant had no record of selling to Big Lots.

Although KRB does not have any record of purchasing from third parties or selling to Big Lots eleven of the sound recordings at issue in Count II, the Court concludes that KRB placed all the Titles in Big Lots stores for sale to the public. The Court comes to this conclusion due to the fact that KRB was the exclusive supplier to Big Lots of music product prior to 2002; therefore, only KRB could have supplied Big Lots with these cassettes. Moreover, several Titles were found in Plaintiff's inspection of the returned product from Big Lots. While KRB maintains that certain of the returned cassettes came from other sources due to Big Lots flexible return policy, the Court finds that implausible due to the exclusive nature of KRB's relationship with Big Lots, and the fact that the cassettes found in the inspection had KRB suppliers' product numbers on the cover. Finally, KRB concedes that the fact that it does not have a record of purchasing or selling certain Titles, does not mean that it did not purchase or sell the Titles. This is because certain purchases were recorded in mixed categories rather than by individual song titles. In sum, the evidence demonstrates that KRB sold all the Titles to Big Lots.

### F. THE LAWSUIT

At some point, Lytle heard rumors that Bennett was buying product from Horner's company, Classic Sound, which Plaintiff had sued for copyright infringement. Lytle knew that KRB serviced Big Lots stores and thus went to investigate whether KRB was supplying Big Lots

-34-

with infringing product. Lytle purchased the KRB products at issue in this litigation at various Big Lots stores in December 1997, January 1998, and February 1998. After purchasing the product, Lytle had his employees listen to KRB's product and compare it to Plaintiff's product. Through this comparison, Lytle formed the belief that KRB's products were copies of Plaintiff's recordings.

Some time before purchasing the KRB product from Big Lots, Lytle had contacted Bennett by telephone. The evidence is unclear whether Lytle called Bennett to discuss whether KRB was exploiting Plaintiff's recordings or to discuss a potential business opportunity. Subsequently, Lytle and Bennett had a meeting in 1997. The exact date of the meeting is unclear, as Lytle testified that it occurred in December 1997, while Bennett testified that it occurred in the summer of 1997. During that meeting, Lytle expressed his concerns that Bennett was infringing on Plaintiff's copyrighted recordings. Bennett requested Lytle to provide a list of potentially infringing product and provide proof that Lytle owned the recordings that he claimed were being infringed. Bennett had taken to the meeting a copy of the Classic Sound catalogue. Neither party explained what titles were included in the Classic Sound catalogue. However, the Plaintiff alleges, and the Court surmises, that it includes the same titles that were a part of the Peachtree Agreement because Peachtree and Classic Sound were both controlled by Horner and the only titles Bennett received the right to exploit from Horner were contained in the Peachtree Agreement. Lytle asked to see and keep a copy of the Classic Sound catalogue, as he believed it

-35-

included titles involved in the Classic Sound Lawsuit.[10]  Bennett refused to provide the catalogue on the basis that it contained third party proprietary information.

On February 3, 1998, Lytle wrote Bennett a letter stating that Lytle continued to believe that KRB was illegally selling Lytle's Titles.  By the time he wrote the letter, Lytle had already purchased all of KRB's product that are at issue in this case.  Nevertheless, Lytle did not furnish Bennett with a list of the allegedly infringing product or any evidence to prove his ownership of that product.  Instead, Lytle simply made a broad allegation that KRB was "handling bootleg copies of G.M.L./Gusto's masters."  Lytle stated "I should have known [that you were selling bootleg copies], when you refused to let me see and copy a Classic Sound catalog that you had . . . ."  Lytle concluded his letter by stating "I feel I have no choice left except to give it to my lawyers."

Bennett responded to Lytle's letter on February 17, 1998.  In that response, Bennett reiterated that Lytle's concerns "never reached a specific statement . . . of any particular violation . . . ."  Bennett further pointed out that Lytle's February 3, 1998 letter still did "not raise any specific issue."  Bennett stated "I am unable to provide you with any response without a specific statement of license violation."  Bennett also reiterated that he would not provide the Classic Sound catalogue because it was third party proprietary information.  Bennett stated that he was aware that Plaintiff was involved in the Classic Sound Lawsuit and was "not interested in being a pawn regarding any issues in that litigation or marketing competition."  Bennett further stated that he was "interested in performing all of [his] legal obligations on a correct and timely

_____

[10]  Recall, this is the copyright infringement lawsuit initiated by Lytle against Horner and his company Classic Sound in 1992 in federal court in the Middle District of Tennessee, and which was identified in the Peachtree Agreement.

-36-

basis in order to maintain [his] reputation and preserve future opportunities to license recordings with valuable publishers such as [Lytle]." Bennett again requested specific information regarding the alleged infringement. On August 20, 1999, prior to the start of this lawsuit, Lytle settled its litigation with Horner and Classic Sound. Neither Lytle nor Horner provided Defendants with any notice of the settlement agreement.

Two years after exchanging letters with Bennett, in February 2000, Lytle returned to a Big Lots store. Lytle purchased additional KRB music product that he believed contained Plaintiff's recordings. This lawsuit ensued in April 2000. Promptly upon being served with the Complaint, KRB took immediate steps to stop the exploitation of any of the titles identified in the Complaint. KRB issued memoranda to KRB employees and contractors instructing them to stop the purchase and sale of any of the titles identified in the Complaint. KRB also instructed its independent service representatives that serviced the music racks in the Big Lots stores across the country to remove from the racks the titles identified in the Complaint. The parties conducted a highly protracted and contentious discovery prior to coming to trial.

### G. COMPARISON OF KRB'S PRODUCTS TO PLAINTIFF'S MASTER RECORDINGS

At trial, in addition to the factual testimony concerning the creation and ownership of all the Titles, Stone offered an expert opinion that Defendants had copied Plaintiff's Titles. Stone has almost forty years experience in the music industry, has extensive experience as an audio engineer and has mixed more than 350 albums and singles. He also designed and relocated the control room in Plaintiff's recording studio. Stone is a past member of the Audio Engineering Society and the National Academy of Recording Arts and Sciences, and has been twice elected

to the latter's board of governors.  He is also a member of the Atlanta Studio Audio Professionals and the National Association of Music Merchandisers.

Stone used Plaintiff's two-track master recordings to make the comparisons because the two-track master recordings are the final masters from which finished products such as tapes and compact discs are made, whereas the sixteen-track master recordings are working masters.  In performing his analysis, Stone looked for certain "footprints" that could be identified in Plaintiff's recordings and that would have been reproduced if KRB had copied Plaintiff's products.  Stone identified numerous "footprints" and distinctive characteristics on KRB's product that were identical to Plaintiff's two-track master recordings, including distinct vocal or instrumental performances and, in some instances, mistakes and sound effects that would be almost impossible to re-create intentionally.  Stone ultimately concluded that the sounds on KRB's product were identical to the sounds appearing on Plaintiff's two-track master recordings.

On cross-examination, Defendants attempted to impeach Stone's credibility.  As noted above, it appears that while with the K-Tel/S.J. Productions joint venture, Stone may have been the recording engineer for certain of the songs for which both K-Tel and Plaintiff have recordings.  Stone, however, could not recall the details regarding the K-Tel/S.J. Productions joint venture recording sessions.  Defendants questioned how Stone could recall minute details regarding Plaintiff's recording sessions, but had no memory of the K-Tel/S.J. Productions joint venture recording sessions.  Defendants implied that this is indicative of the fact that Stone actually recorded the Titles at issue in the present lawsuit for the K-Tel/S.J. Productions joint venture and not for Plaintiff.

-38-

While the Court notes that Stone has significant ties with Plaintiff, the Court found Stone to be a credible witness. Furthermore, his testimony that recording sessions for the Titles occurred at Plaintiff's recording studio was supported with significant documentary evidence. Importantly, Defendants did not show in which K-Tel/S.J. Productions recording sessions Stone participated. The Court's own analysis of the recording sheets for the K-Tel/S.J. Productions reveals that Stone may have been a recording engineer for some of the same sound recordings involved in Count II. Defendants neglected to ask Stone to authenticate his signature on these recording sheets. As a result, it is unclear if Stone participated in recordings sessions for any of the K-Tel/S.J. Productions master recordings. Finally, Defendants did not present a comparison between Plaintiff's and K-Tel's master recordings. Therefore, their allegation that Stone's memory is faulty and he is recounting the recording sessions that took place at the recording studio for the K-Tel/S.J. Productions joint venture is unsubstantiated.

Similarly, Defendants question Stone's neutrality as an expert because of his ties to Plaintiff. Defendants, however, did not challenge Stone's actual comparison of Plaintiff's two-track masters to KRB's product. Indeed, Defendants offered no evidence to rebut Stone's opinion regarding the similarities between KRB's product and Plaintiff's Titles.

Defendants further contend that Stone should have compared the sixteen-track master recordings to KRB's product, instead of relying only on the two-track master recordings. Such a comparison would have been irrelevant because Plaintiff is not arguing infringement of the sixteen-track masters. Indeed Plaintiff cannot because it did not copyright the sixteen-track masters; Plaintiff only copyrighted the two-track masters.

Consequently, the Court finds Stone to be a credible fact and expert witness and adopts in its entirety his expert report, which was read into the record.  (See Doc. No. 199, Trial Tr. Vol I at 69-153.)

## II.     DISCUSSION

### A.     COPYRIGHT INFRINGEMENT

*1.     Ownership*

In order to establish a claim for copyright infringement, a plaintiff must establish that it owns a copyrighted work.  Kohus v. Mariol, 328 F.3d 848, 853 (6th Cir. 2003).  A certificate of registration constitutes prima facie evidence of the ownership and validity of the copyright, which evidence is rebuttable.  Boisson v. Banian, Ltd., 273 F.3d 262, 268 (2d Cir. 2001).  "[T]he burden of proving ownership is at all times on the party claiming infringement."  BancTraining Video Sys. v. First Am. Corp., No. 91-5340, 1992 WL 42345, at *4 (6th Cir. Mar. 3, 1992).

### a.     Count I – "Don't Fall Asleep at The Wheel"

The certificate of registration for "Don't Fall Asleep at the Wheel" would normally constitute prima facie evidence of ownership.  However, the certificate of registration incorrectly lists the claimant as Power Play Music, Inc.  First, Power Play Music, Inc. is not the named plaintiff in this case.  Second, there is no evidence in the record that a corporation entitled Power Play Music, Inc. existed on December 18, 1992, the effective date of the certificate of registration.  The evidence shows that the original authors of the musical composition, John Riggs and Gary Lumpkin, transferred their rights in "Don't Fall Asleep at the Wheel" to "Power

-40-

Play Music, a Division of Gusto Records." Lytle testified at trial that the copyright claimant on the registration should have been "Power Play Music, a Division of Gusto Records," and the reference to "Power Play Music, Inc." was a mistake.

In an apparent attempt to rectify the mistake, Lytle executed two assignments and Kountzman executed one assignment purporting to assign the rights in "Don't Fall Asleep at the Wheel" to Plaintiff. Plaintiff, it seems, was entirely asleep at the wheel, as these assignments are riddled with error and, more fundamentally, are completely invalid. The first is from GML to Plaintiff. GML never owned the rights in this musical composition so it could not transfer them to Plaintiff. The second assignment is from Power Play Music, Inc. to Plaintiff. This assignment is also invalid because Power Play Music, Inc. did not exist at the time the assignment was executed. The third assignment is from Power Play Music, Inc. or Power Play, Inc., neither of which existed at the time of the assignment. It is worth noting that even if Power Play Music, Inc. had existed at the time of the assignments, it could not have assigned any rights in "Don't Fall Asleep at the Wheel" to Plaintiff because it did not own any of the rights. The only entity that could execute a valid assignment was "Power Play Music, a Division of Gusto."

The futile assignments aside, the question remains whether a mistake regarding the identity of the copyright claimant on the certificate of registration invalidates the copyright. Courts are generally lenient with regard to defects in copyright registrations, as they seek to preserve copyrights. <u>Urantia Found. v. Burton</u>, No. K 75-255 CA 4, 1980 U.S. Dist. LEXIS 16302, at *9 (W.D. Mich. Aug. 27, 1980). This is especially true when the mistake did not affect the decision of the Copyright Office in issuing the certificate. <u>Id.</u> at *10. In an effort to preserve copyrights, the Sixth Circuit has held that an innocent misstatement or clerical error in the

application and certificate of registration, if unaccompanied by fraud, does not invalidate the copyright nor render the certificate of registration incapable of supporting an infringement action. Advisers, Inc. v. Wiesen-Hart, Inc., 238 F.2d 706, 708 (6th Cir. 1956); 2 Nimmer on Copyright, § 7.20[B], at 7-210. Thus, parties seeking to prove fraud or prejudice sufficient to invalidate a copyright bear a heavy burden. Lennon v. Seaman, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000).

An unintentional error in a certificate of registration that does not mislead the public as to the existence of the copyright or the true owner of the copyright or otherwise prejudice a defendant does not invalidate the certificate of registration. Bourne Co. v. Walt Disney Co., No. 91 Civ. 344, 1992 U.S. Dist. LEXIS 22729, at *4 (S.D.N.Y. Dec. 1, 1992) (holding that copyright claimant mistakenly identified as dissolved entity, Bourne, Inc. instead of Bourne, Co., was insufficient to invalidate certificate of registration absent showing of prejudice); Alart Assoc., Inc. v. Aptaker, 279 F. Supp. 268, 270 (S.D.N.Y. 1968) (holding that misidentified copyright claimant Alart, Inc. was sufficiently close to plaintiff's true name, Alart Associates, Inc., to identify plaintiff as copyright owner such that public would be aware of existence of copyright and not be misled).

Applying these principles, courts have held that the improper designation of the copyright claimant on a registration certificate is not grounds to dismiss an infringement claim. See Wales Indus. Inc. v. Hasbro Bradley, Inc., 612 F. Supp. 510 (S.D.N.Y. 1985), overruled on other grounds by Hasbro Bradley, Inc. v. Sparkle Toys, Inc., 780 F.2d 189 (2d Cir. 1985). Hasbro sued Wales for copyright infringement. Wales argued that Hasbro had misidentified itself as a copyright claimant when Hasbro was in fact only a limited licensee. Id. at 515. The

-42-

court noted that even assuming Wales was correct, Hasbro could still maintain an action for copyright infringement:

> Hasbro's error, if any, would not be jurisdictional but a technical misdescription: it should have identified Takara rather than itself as the "copyright claimant" on the registration applications it submitted. Such error could be readily corrected by Hasbro's filing supplementary registrations with the Copyright Office. Since there is no indication that the claimed error was committed knowingly, and since the identification of the copyright claimant as Takara rather than Hasbro would not have occasioned rejection of the applications by the Copyright Office, the alleged error would not require dismissal of Hasbro's infringement claims.

Id.

Likewise, in <u>Dealer Adver. Dev., Inc. v. Barbara Allan Fin. Adver., Inc.</u>, No. K 77-251 CA 4, 1979 U.S. Dist LEXIS 8428, at *43-46 (W.D. Mich. Nov. 21, 1979), the court upheld the validity of a registration that contained mistakes regarding the corporate copyright claimant's state of incorporation. The court reasoned that 1) the state of incorporation was mere surplusage, since there was no legal requirement to include such information, and 2) even assuming an error in identification, such error would not affect the validity as there was no prejudice to the public because the corporate copyright claimant's name remained the same and the copyright notice that applied to the works remained the same. <u>Id.</u> at *44-45. As the court explained: "Mere technicalities should not be permitted to diminish the benefits conferred by the certificate of copyright registration, particularly when, as here, neither the defendants nor the public could have been prejudiced by the alleged deviation." <u>Id.</u> at *43.

Most of the above-cited cases found that a mistake in the identity of the corporate copyright claimant was a "technical" error. They did so, however, because the mistake in identity was minimal. Either the name on the certificate of registration was close, but not identical to the plaintiff, or the name was the same, but the state of incorporation was incorrectly

identified.  In the present case, however, the name of corporate copyright claimant, Power Play

Music, Inc., is entirely different from the Plaintiff, King (formerly known as Gusto).  Further,

these are two separate entities, albeit owned by the same individual and located at the same

address.  Finally, Plaintiff realized the mistake but did not follow the procedures outlined in 17

U.S.C. § 408(d)[11] or 37 C.F.R. § 201.5 to correct the mistake.  Instead, Lytle and Kountzman

completed three invalid assignments attempting to transfer the rights in "Don't Fall Asleep at the

Wheel" to Plaintiff.  These facts taken together do not show a "minimal" mistake, rather they

show mistake piled upon mistake.

Nevertheless, the Court is mindful of its mandate to preserve copyrights.  In addition,

Defendants bear a heavy burden to prove that the misidentification of the copyright claimant on

the certificate of registration was fraudulent or prejudicial such that the copyright must be

invalidated.  Defendants have not met their burden.  Defendants do not cite any facts that would

support fraud.  The facts suggest that the misidentification on the certificate of registration was a

clerical error.  The copyright claimant should have been identified as "Power Play Music, a

division of Gusto."  The subsequent invalid assignments simply highlight this penchant for

clerical error because all three assignments are filled with similar errors.  Further, Defendants

---

[11]  17 U.S.C. § 408(d) provides:

Corrections and Amplifications.--The Register may also establish, by regulation,
formal procedures for the filing of an application for supplementary registration,
to correct an error in a copyright registration or to amplify the information given
in a registration. Such application shall be accompanied by the fee provided by
section 708, and shall clearly identify the registration to be corrected or amplified.
The information contained in a supplementary registration augents but does not
supersede that contained in the earlier registration.

-44-

have not shown how they have suffered any prejudice. Both Power Play Music, Inc. and King (formerly known as Gusto) are owned by Lytle, and the business address on the certificate of registration is accurate. With the facts listed on the certificate, the correct corporate copyright claimant could have been located. The mistake would not have misled anyone to believe that the copyright did not exist. Finally, this is the type of error that would not have affected the decision of the Copyright Office in granting the copyright. Based on these facts, any mistake in the name of the claimant did not prejudice Defendants.

The correct copyright claimant, therefore, is Power Play Music, a division of Gusto. As Power Play Music was a division of Gusto, it was not a separate corporate entity, but simply a part of Gusto. Thus, Gusto had all the rights in "Don't Fall Asleep at the Wheel." Gusto became King in 2001. As a result, Plaintiff owns all rights, including the copyright, in "Don't Fall Asleep at the Wheel."

### b.      Count II – Sound Recordings

The registrations for the sound recordings are prima facie evidence of ownership. As explained above, Plaintiff has also presented additional evidence of ownership. This evidence includes the testimony of Stone, who identified the master recordings and the photographs of numerous artists in Plaintiff's studio at or near the time Plaintiff created the master recordings; evidence of payment to artists and musicians involved in the recording, as well as evidence of production costs; and contracts between Plaintiff and Lofredo or Plaintiff and the artists demonstrating how Plaintiff obtained the rights to the master recordings. See supra Section I.B.

i.    Effect on Ownership of Compilation Registration

Defendants do not challenge Plaintiff's ownership in the copyright registrations of "Fraulein" or "Amazing Grace."  Defendants do challenge Plaintiff's copyright ownership in the remaining nineteen sound recordings.  Defendants argue that the copyright certificates for these nineteen sound recordings are for compilations and not for the individual sound recordings.  That is, Plaintiff copyrighted the album instead of the individual sound recording.  Thus, relying solely on dicta in a Supreme Court case, Defendants contend that while the copyright for the album may be valid, such copyright does not extend to the individual sound recordings that are on the album.  Defendants argue that in order to obtain copyright protection for each sound recording, Plaintiff must separately register each sound recording with the Copyright Office. While the Copyright Act is unclear on this issue, the case law does not provide support for Defendants' position.

The Copyright Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.  The term 'compilation' includes collective works."  17 U.S.C. § 101.  A compilation may consist of original materials or data that are separately copyrightable.  1 Nimmer on Copyright, § 3.02, at 3-6-3-7.  When the original materials or data of a compilation are separately copyrightable, it is called a "collective" work.  See 17 U.S.C. § 101 (defining "collective" work as "work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."); see also 37 C.F.R. § 202.3(b)(3).  The Copyright Act, however, is silent as to whether registration of a

-46-

"collection" extends copyright protection to each copyrightable element in the collection, or just protects the authorship, if any, involved in selecting and assembling the collection. While the case law in the Sixth Circuit is silent on this issue, other courts have found that registration of a collection extends copyright protection to each copyrightable element in the collection.

The Fifth Circuit was faced with the exact issue that this case presents, namely, "whether a copyright of a 'collection' of individual songs, whose titles are not individually listed on the copyright registration, extends copyright protection to the collection as a whole <u>and</u> to the individual songs, or just to the collection as a whole." <u>Szabo v. Errisson</u>, 68 F.3d 940, 942 (5th Cir. 1995) (emphasis in original). The court held that "a copyright of a collection of unpublished works protects the individual works that are copyrightable, regardless of whether they are individually listed on the copyright certificate." <u>Id.</u> at 943. In <u>Szabo</u>, the plaintiff registered a collection of songs under the title "Scott Szabo's Songs of 1991." <u>Id.</u> at 941. The particular song at issue, entitled "Man v. Man," was listed on the deposit copy, but was not named on the registration certificate. <u>Id.</u> at 942. Nevertheless, the court found that the registration of the album protected the individual song. <u>Id.</u> at 943. Whether the individual song was named on the certificate was simply irrelevant. <u>Id.</u> at 942-43.

The court in <u>Sylvestre v. Oswald</u>, No. 91 Civ. 5060 (JSM), 1993 U.S. Dist LEXIS 7002, at *4 (S.D.N.Y. May 18, 1993), reached the same conclusion. In that case, plaintiffs alleged defendants had infringed plaintiffs' copyright in a song entitled "Heaven." <u>Id.</u> at *1. Defendants claimed the only registration offered was for a work called "Cherry Bomb." <u>Id.</u> at *3. "Cherry Bomb" was the title of a collection of fifteen songs contained on a single cassette tape. <u>Id.</u> Defendants claimed that the registration certificate did not cover the individual song "Heaven"

-47-

because it was not named on the certificate.  Id.  The court rejected defendant's argument and found the collective registration protected each discrete song.  Id. at *6.

Other courts not dealing with music reached the similar conclusion that the registration of a collective work may be sufficient to permit an infringement action of the constituent part.  See Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 283 (4th Cir. 2003) (adopting view "that where owner of a collective work also owns the copyright for a constituent part of that work, registration of the collective work is sufficient to permit an infringement action of the constituent part."); Morris v. Bus. Concepts, Inc., 259 F.3d 65, 68 (2d Cir. 2001) (same); Educ. Testing Servs. v. Katzman, 793 F.2d 533, 539-40 (3d Cir. 1986) ("The fact that a registrant denominates the material as a compilation does not in itself signify that the constituent material is not also covered by the copyright.  In fact, the statutory premise that the copyright in a compilation extends to the constituent material contributed by the author is express . . . ."); Malaco Inc. v. Cooper, No. 3:00-CV-2648-P, 2002 U.S. Dist. LEXIS 12069, at *8 (N.D. Tex. July 3, 2002) ("copyright of a collection can protect the individual components of that collection even when the individual components are not listed on the copyright registration."); Howard v. Sterchi, 725 F. Supp. 1572, 1575 n.6 (N.D. Ga. 1989) ("the mere fact that components in a collective work are more easily severed does not compel the conclusion that they must be severed and separately registered.") (emphasis in original).

Defendants argue that these cases are inapplicable because they do not deal with sound recordings.  Defendants attempted distinction is irrelevant.  In Szabo, the court held that "a copyright of a collection of unpublished works protects the individual works that are copyrightable, regardless of whether they are individually listed on the copyright certificate."  68

-48-

F.3d at 943.  The court did not limit this ruling to musical compositions, with which it was

dealing.  Instead, the limitation was simply that the individual parts of a collection must be

copyrightable in and of themselves.  Defendants do not argue (and rightly so) that sound

recordings are not copyrightable.  See 17 U.S.C. 102(a)(7) ("Copyright protection subsists . . . in

original works of authorship . . . .  Works of authorship include the following categories: . . . (7)

sound recordings.")  As sound recordings are copyrightable, the rule from Szabo is applicable

and individual sound recordings that are part of a collection are protected by copyright, even if

the certificate of registration only identifies the collection, and not each sound recording

comprising the collection.[12]

     Defendants challenge this body of law.  They contend that these cases are no longer good

law in light of dicta in the Supreme Court's ruling in Dastar Corp. v. Twentieth Century Fox

Film Corp., 539 U.S. 23 (2003).  Defendants' reliance on Dastar is misplaced.  In Dastar,

plaintiff Twentieth Century Fox ("Fox") originally held the copyright to a television series

entitled "Crusader in Europe," which was based on General Dwight D. Eisenhower's book of the

allied campaign in Europe during World War II.  Id. at 25.  The television series consisted of

twenty-six episodes, which combined narration of Eisenhower's book with film footage from the

---

    [12] The Court notes certain minor distinctions between Szabo and this case, which are also
irrelevant.  First, Szabo was dealing with unpublished works and, therefore, required that the
copyright author and claimant be the same.  68 F.3d at 943.  Second, Szabo implied that while
the individual musical compositions did not have to be listed on the certificate of registration,
they did have to be deposited with the Copyright Office.  Id.; cf. Sylvestre, 1993 U.S. Dist
LEXIS 7002, at *4-6 (doubting, but not deciding, whether the "copyright certificate
encompasses whatever is deposited with the copyright office . . . .").  In this case, although
dealing with published works, Plaintiff is both the author and claimant of the copyrights.
Similarly, a label copy identifying each individual song on the albums was deposited with the
Copyright Office.

United States Army, Navy, and Coast Guard, among others.  Id. at 26.  The television series was copyrighted as a compilation, but the original film footage was not copyrighted.  Id. at 37.  Fox allowed its copyright in the series to expire in 1977, leaving the series in the public domain.  Id. at 26.  Defendant Dastar Corporation ("Dastar") purchased copies of the original, public domain television series.  Id.  Dastar copied and edited the series before selling it as its own product under the title Campaigns in Europe.  Id. at 26-27.  Fox and several licensees brought suit, alleging, inter alia, that Dastar's sale of Campaigns in Europe without proper attribution to the Crusade in Europe series constituted "reverse passing off" in violation of 15 U.S.C. 1125(a).  Id.

After deciding the "reverse passing off" claim, in dicta the Supreme Court demonstrated how a "reverse passing off" claim is distinct from a copyright infringement claim.  In doing so, the Supreme Court stated: "The original film footage used in the Crusade television series could have been copyrighted, see 17 U.S.C. § 102(a)(6), as was copyrighted (as a compilation) the Crusade television series, even though it included material from the public domain, see § 103(a)."  Id. at 37-38.  Defendants interpret this as follows: "From this statement, it is evident that the Supreme Court considered the Crusade television series copyrighted . . ., but did not consider the original film footage used therein . . . [to have been] copyrighted, saying it merely 'could have been copyrighted' (and by implication, not actually copyrighted, like the entire series."  Thus, Defendants interpret this as an affirmative statement by the Supreme Court that the constituent parts of a compilation are not protected by copyright unless they are separately registered.

The Court does not interpret this dicta in Dastar in the same manner.  This Court understands the Supreme Court to be stating that there were two ways in which Fox could have

-50-

brought a copyright infringement claim. The first would have been if the original film footage was copyrighted and the second would have been if the copyright in the television series was renewed. By pointing out that the original film footage was copyrightable separate and apart from the television series, the Supreme Court did not affirmatively state that those portions of the original film footage included in the television series were not copyrighted. Rather, the Supreme Court simply noted that constituent parts of a collective work may be separately copyrightable. This reading of the Supreme Court's dicta is consistent with the Copyright Act, which specifically defines a "collective" work as a "work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, <u>constituting separate and independent works in themselves</u>, are assembled into a collective whole." 17 U.S.C. § 101 (emphasis added); <u>see also</u> 1 <u>Nimmer on Copyright</u>, § 3.02, at 3-7. ("Those compilations that consist of contributions that themselves constitute "works" capable of copyright are called collective works."). The Supreme Court, however, was silent as to the issue that faces the Court: whether the constituent parts <u>must be</u> separately registered in order to obtain copyright protection or whether the registration of the collection is sufficient. In light of the Supreme Court's silence on this issue, the Court follows the body of law developed by other courts and holds that the copyright of a collection of sound recordings in the form of an album extends copyright protection to both the album and the individual sound recordings contained therein, regardless of whether the sound recordings are individually listed on the certificate of registration.

-51-

ii.    Validity of Plaintiff's Artist Agreements

### 1.    *Rule 901 Objection*

Defendants challenge Plaintiff's ownership in "Venus in Blue Jeans," "Charlie Brown," "Mountain's High," "Bottle of Wine," "Ain't Got No Home," "My Guy," "You Beat Me to the Punch," "The One Who Really Loves You," "Two Lovers," and "Keep Searchin'."  Plaintiff's rights to these sound recordings were obtained through Lofredo.  Defendants challenge the authenticity of the agreements entered into by the artists and Lofredo.  Defendants assert that Plaintiff did not introduce the original artist contracts and the copies are not authenticated pursuant to Rule 901 of the Federal Rules of Evidence.

Defendants' objection is OVERRULED, as these contracts fall within the meaning of ancient documents under Rule 901(b)(8) of the Federal Rules of Evidence.  Rule 901(b)(8) states that a document is authentic if it "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."

The artist contracts appear to be authentic because Kountzman, vice president of King, testified that he recognized Lofredo's signature; the artists' signatures do not appear to be altered; one artist, St. John, testified that he signed the agreement, along with his wife Sandy St. John; and Plaintiff introduced photographic evidence of several artists appearing at Plaintiff's studios to record the songs pursuant to the terms of the contracts.  Copies of the artist agreements were attached as exhibits to the assignments from Lofredo to Plaintiff, and have been in Plaintiff's business records ever since.  Finally, these documents are over twenty years old.

Further, Plaintiff released albums with sound recordings produced pursuant to the agreements and no evidence was presented to the Court that the artists challenged these albums or the validity of the agreements. While Defendants implicitly allege that these artist contracts were fraudulently obtained by Lofredo or Plaintiff, they produced no evidence to support such allegation. In conclusion, the evidence taken as a whole does not favor Defendants' theory that Lofredo or Plaintiff fraudulently obtained the artists' signatures.

### 2. Similarity of K-Tel Artist Agreements on Plaintiff's Agreements

Next, Defendants assert that the artist agreements that K-Tel obtained were substantially similar to the artist agreements that Plaintiff obtained from Lofredo or entered into itself. That is, the form and terms of K-Tel's, Lofredo's and Plaintiff's agreements with the various artists are virtually identical. Defendants imply that because K-Tel had similar agreements, Plaintiff either fraudulently created its artist agreements based on K-Tel's agreements and made master recordings, or copied K-Tel's master recordings and later created the paperwork to show that they had the rights to the master recordings. The evidence does not support either of these theories.

First, the payment terms in the agreements were different. Second, different songs (that are not part of Count II) were included in K-Tel agreements, but were not included in Plaintiff's agreements, or vice versa. Third, for the most part, the K-Tel artist agreements were entered into prior to Plaintiff's artist agreements. The K-Tel agreements, however, did not preclude the artist from re-recording a different master recording with another studio. Instead, the K-Tel artist agreements only provided K-Tel exclusive rights in the master recording that K-Tel produced.

-53-

In certain instances, the K-Tel artist agreements specifically stated that they were non-exclusive. In contrast, Plaintiff's artist agreements, entered into after K-Tel's agreements, did sometimes include a clause prohibiting the artist from re-recording the songs with another studio within a certain time frame. Fourth, there are separate track sheets showing that K-Tel's master recordings were recorded at different locations, dates and recording sessions than Plaintiff's master recordings. Thus, while Plaintiff's recording sessions took place at Plaintiff's studio on Dickerson Road in Nashville, K-Tel's recordings took place at Audio Media on 19th Avenue South in Nashville. Fifth, while Lofredo was involved in obtaining the artists for both K-Tel and Plaintiff, there is no evidence that Lofredo transferred the K-Tel master recordings or K-Tel artist agreements to Plaintiff. At no point during the trial did Defendants compare the K-Tel master recordings to Plaintiff's master recordings. Absent such a comparison, the evidence presented shows that Plaintiff's master recordings are different from K-Tel's master recordings.

### 3. Differences in Signature on K-Tel's and Plaintiff's Agreements

Similarly, Defendants attempted to argue that the signatures on Plaintiff's agreements of Johnny Paycheck, Clarence Carter, Del Shannon and St. John were forged. Defendants' theory is based on a perceived difference between the artists' signatures on K-Tel's agreements and the same artists' signatures on Plaintiff's agreements. St. John, as explained above, testified that he signed two agreements. Whatever perceived differences there are in the two signatures, therefore, are clarified by his testimony. With regard to Johnny Paycheck, the Court notes that Plaintiff entered into its agreement with the artist almost a month earlier than K-Tel. K-tel does not explain from what Plaintiff could have copied Johnny Paycheck's signature. Further, the

Court has examined the signatures of the four artists on both parties' agreements and finds no significant difference, save for Clarence Carter's signature. With regard to Clarence Carter, the Court notes that on Plaintiff's agreement a third party has initialed below Clarence Carter's signature, indicating that a third party signed for Clarence Carter.

### 4. *Plaintiff's Failure to Obtain Waiver/Authorization*

Finally, Defendants attack Plaintiff's agreement with Johnny Paycheck. Defendants note that Johnny Paycheck could not re-record "Take this Job and Shove It" without express permission from CBS Records due to Johnny Paycheck's prior contracts with the latter. Defendants presented evidence that K-Tel obtained such waiver, but Plaintiff did not. In discovery, Plaintiff produced exactly the same waiver that K-Tel claimed it obtained directly from CBS Records and attempted to use it as evidence of a valid waiver from CBS Records to Plaintiff. A close reading of the waiver reveals that it pertains to K-Tel's contract and not to Plaintiff's contract with Johnny Paycheck. This is because the waiver refers to "sixteen" recordings. K-Tel's contract with Johnny Paycheck included sixteen recordings, whereas Plaintiff's only included ten.

Notwithstanding the fact that Plaintiff did not have a waiver from CBS Records, Plaintiff's contract with Johnny Paycheck is valid. Plaintiff was not required to obtain a waiver from CBS Records. CBS Records' waiver, although addressed to K-Tel, did not state that CBS Records agreed to waive the re-recording restriction between K-Tel and CBS Records, rather it stated that CBS Records agreed to waive the re-recording restriction "between Johnny Paycheck and CBS Records." Therefore, Johnny Paycheck was free to re-record as many recordings of

-55-

"Take this Job and Shove It" with as many recording studios as he wished, as long as the subsequent contracts did not include any restrictions. Moreover, Johnny Paycheck specifically warranted to Plaintiff that "there were no restrictions with respect to the compositions [he was] . . . engaged to record for" Plaintiff.

Similarly, Defendants argue that Plaintiff was required to obtain authorization from Dee Dee Phelps in order for St. John to re-record "Mountain's High." As previously explained, St. John testified that he obtained an authorization from Dee Dee Phelps to re-record "Mountain's High" in 1976 and did not believe a second authorization was required in 1977 at the time he entered into the agreement with Lofredo.

In sum, the Court finds no merit in Defendants' arguments that Plaintiff does not own the copyrights to the sound recordings in Count II.


2.      *Copying*

After proving ownership, the plaintiff must establish that the defendant copied the plaintiff's copyrighted work. Kohus, 328 F.3d at 853. In most cases, as in this case, there is no direct evidence of copying. Accordingly, courts must rely on inferences drawn from (1) a defendant's access to the allegedly infringed work; and (2) the substantial similarity between defendant's work and the allegedly infringed work. Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp., 361 F.3d 312, 316 (6th Cir. 2004). If a plaintiff is able to establish the inference of copying, a defendant may rebut such an inference with proof of independent creation of the allegedly infringing work. Ellis v. Diffie, 177 F.3d 503, 507 (6th Cir. 1999).

-56-

## a.    Access

Access is proven when a plaintiff shows that the defendant saw or had a reasonable opportunity to see plaintiff's work, and therefore had the opportunity to copy.  Id. at 506.  "Access may not be inferred through mere speculation or conjecture.  There must be a reasonable possibility of viewing the plaintiff's work -- not a bare possibility."  4 Nimmer on Copyright, § 13.02[A], at 13-21; see also Ellis, 177 F.3d at 506.  An assertion of access must be supported by probative evidence.  Murray Hill, 361 F.3d at 316.  Where there is no direct evidence of access, such as when the defendant denies having seen the allegedly infringed work, circumstantial evidence may be used to demonstrate reasonable access.  Two forms of circumstantial evidence are accepted as evidence of reasonable access:  (1) a particular chain of events establishing defendant's access to plaintiff's work, or (2) plaintiff's work has been widely disseminated.  Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000).

Where access cannot be proved through either direct or circumstantial evidence, the plaintiff must show a striking similarity between the allegedly infringed work and defendant's work, rather than the lower substantially similar standard.  Murray Hill, 361 F.3d at 317.  If the plaintiff is able to prove striking similarity, additional proof of access is not required.  This is because "striking similarity carries the burdens of proof that the infringing work is sufficient[ly] similar as to intrude into the copyrighted work's protection and that the defendant must have had access to the copyrighted work, even if the plaintiff can provide no extrinsic proof of that fact."  Id. (emphasis in original); see also Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1170 (7th Cir. 1997) (holding that a showing of striking similarity constitutes proof of access and the plaintiff need not produce some other evidence of access); Bouchat v. Baltimore Ravens, Inc., 241 F.3d 350, 356 (4th Cir. 2000) ("It is clear that a showing of striking similarity does not per

-57-

se relieve the plaintiff of his burden of establishing access. However, striking similarity is circumstantial evidence of copying, thereby supporting an inference of access.")

In the present case, Defendants' access to the Titles was heavily disputed. KRB obtained the various Titles at issue in this case through third parties. KRB either reproduced copies from master recordings that the third parties provided, or purchased the finished product directly from the third parties. These third parties included, Peachtree managed by Horner, Red Dog Express managed by Sehorn, Creative Sounds managed by LaMonte, and Golden Circle. Plaintiff contends that these companies and their principals were not legitimate purveyors of music and each has faced allegations of misappropriating the intellectual property rights of others. From this statement, Plaintiff wishes the Court to presume that these third parties copied Plaintiff's Titles, and licensed and/or sold copies of the Titles to KRB. Plaintiff, however, fails to establish a chain of events between Plaintiff, these third parties and KRB. See Three Boys Music Corp., 212 F.3d at 477. Further, Plaintiff presented no proof whether its Titles were widely disseminated. Id. Thus, there is very little evidence to demonstrate how these third parties obtained Plaintiff's Titles in order to license and/or sell them to Defendants.

i.      Horner, Classic Sound and Peachtree

KRB obtained the license to manufacture and sell "Don't Fall Asleep at the Wheel," "Patches," and "When a Man Loves a Woman" through the Peachtree Agreement. Plaintiff contends that Peachtree, through Horner, obtained Plaintiff's recordings of this musical composition and two sound recordings. Indeed, Plaintiff asserts that it had initiated various lawsuits against Horner and his companies regarding Horner's misappropriation of Plaintiff's recordings. The first lawsuit initiated in 1992 was identified in the Peachtree Agreement as

-58-

GML, Inc. v. Classic Sound, Inc., Case No. 3-92-0431 (M.D. Tenn. 1992), which the Court has already defined as the Classic Sound Lawsuit.  The second lawsuit, Gusto Records, Inc. and G.M.L., Inc. v. Classic Sound, Inc., Case No. 3-96-0678 (M.D. Tenn. 1996), related to Mary Wells' "Two Lovers," "The One Who Really Loves You," and "You Beat Me to the Punch."[13] The third lawsuit, Gusto Records, Inc. and G.M.L., Inc. v. Classic Sound, Inc. and Peachtree Music, Inc., Case No. 3-97-1165 (M.D. Tenn. 1997) related to the master recording of Bobby Helms' "My Special Angel."

Gusto and GML entered into a settlement agreement with Horner, Classic Sound and Peachtree that resolved the disputes in all three lawsuits.  The attachment to this settlement agreement lists the defendants' allegedly infringing product.  Included in that list are "When a Man Loves a Woman," and "Patches."  The sound recording of "When a Man Loves a Woman," however is not Plaintiff's sound recording.  Rather, it is a recording that Horner obtained from a third party, David Johnson.  The settlement agreement permitted the defendants to "continue to exploit, for a period of eighteen months from . . . [August 20, 1999], the master recordings of Percy Sledge which defendants leased from David Johnson."

For purposes of the present lawsuit, therefore, the only overlap between the three Classic Sound lawsuits and the Peachtree Agreement involves "Patches."  However, no evidence was presented that the recording of "Patches" in the Classic Sound lawsuits was the same as the recording of "Patches" that was licensed to KRB through the Peachtree Agreement.  Similarly,

---

[13]  As the Court has already noted, KRB did obtain a license through the Peachtree Agreement to reproduce and sell Mary Wells' "My Guy," "The One Who Really Loves You," "Two Lovers," and "You Beat Me to the Punch."  Plaintiff, however, is not claiming copyright infringement of these Mary Wells' recordings KRB obtained from the Peachtree Agreement. Instead, Plaintiff is only asserting copyright infringement of Mary Wells' recordings that KRB obtained from Golden Circle.  See supra n.9.

there was not a shred of evidence regarding how Peachtree obtained "Don't Fall Asleep at the Wheel." In sum, contrary to Plaintiff's allegations, the Classic Sound lawsuits do not establish the requisite chain of events that would demonstrate how Peachtree obtained the musical composition and two sound recordings in order to license them to KRB.

ii.    <u>Red Dog Express</u>

Plaintiff presented no evidence of how Red Dog Express obtained "Keep Searching'," "Bottle of Wine," "Ain't Got No Home," "The Mountain's High," and "Charlie Brown" in order to sell them to KRB. In contrast, evidence was presented that the cassettes containing these five sound recordings that KRB obtained from Red Dog Express may have been copies of K-Tel master recordings or yet other master recordings.

In 1987, Red Dog Express entered into an agreement with Lofredo to license the master recordings in: "Keep Searching'," "Bottle of Wine," "Ain't Got No Home," "The Mountain's High," and "Charlie Brown," as well as "Venus in Blue Jeans," "Good Morning Starshine," "My Guy," "You Beat me to the Punch," "The One Who Really Loves You," and "Two Lovers." Mary Kuehn, an employee of K-Tel who testified in this trial, implied that Lofredo fraudulently licensed the K-Tel master recordings in these songs to Red Dog Express. Other than this allegation, no evidence was presented regarding which master recordings Lofredo assigned to Red Dog Express. As a result, these master recordings could have been K-Tel's, Plaintiff's or another set of recordings. Moreover, no evidence was presented regarding how or when KRB purchased product from Red Dog Express. Therefore, it is unclear whether Red Dog Express sold KRB any of the master recordings it obtained from Lofredo.

-60-

In addition, Red Dog Express also fraudulently entered into an agreement with S.J. Productions to license several hundred K-Tel master recordings, including, "Family Bible," "Take This Job and Shove It," "Good Morning Starshine," "Keep Searchin'," "When a Man Loves a Woman," "My Guy," "You Beat me to the Punch," "The One Who Really Loves You," "Two Lovers," "Patches," "Charlie Brown," "Bottle of Wine," "Wings of a Dove," "My Special Angel," and "Ain't Got No Home." In 1992, K-Tel brought suit in Federal District Court in the Eastern District of Texas against numerous defendants, including Sehorn and his company Red Dog Express, regarding the fraudulently obtained license agreement with S.J. Productions. In that suit, the court held that Sehorn and Red Dog Express did not have any rights to the K-Tel re-recordings resulting from the fraudulently obtained license agreement with S.J. Productions. K-Tel Int'l, Inc. v. William Chester Carr, et al., 6:92 CV 480 (E.D. Tex. April 20, 1994) (Wayne, J.). As no evidence was presented regarding how or when KRB purchased product from Red Dog Express, it is unclear whether Red Dog Express sold KRB any of the K-Tel master recordings that were at issue in the Texas lawsuit.

In sum, from the "access" viewpoint, the evidence is entirely unclear as to whose recordings of "Keep Searching'," "Bottle of Wine," "Ain't Got No Home," "The Mountain's High," and "Charlie Brown" Red Dog Express (doing business with Creative Sound) sold to KRB.[14]

---

[14] Defendants suggest that Plaintiff had authorized KRB's suppliers to exploit the Titles. In the early 1990s, Plaintiff initiated litigation against Sehorn and his company Red Dog Express, and LaMonte and his company Creative Sounds. Plaintiff settled these lawsuits by giving Sehorn the right to license certain master recordings to LaMonte or any other third party. As Red Dog Express and Creative Sounds had a license to certain of Plaintiff's master recordings, goes Defendants' argument, that license was extended to KRB when KRB purchased product from Red Dog Express and Creative Sounds. Defendants argument may have had merit if the Titles in this case corresponded to the titles in the settled lawsuits. The titles in the settled lawsuits, however, relate to a catalogue of master recordings referred to as the "Springboard

iii.    <u>Creative Sound and Golden Circle</u>

With regard to the remaining fourteen Titles at issue in this case, other than Plaintiff's speculation that KRB's third party sources for these Titles -- Creative Sounds and Golden Circle -- were of questionable character, and therefore must have copied from Plaintiff's albums, there is <u>no</u> proof of how these companies obtained the fourteen Titles.

Consequently, Plaintiff did not demonstrate how Horner and his companies Peachtree and Classic Sound, Sehorn and his company Red Dog Express, LaMonte and his company Creative Sounds, and Golden Circle obtained copies of the Titles at issue in this case.  Nor did Plaintiff present any evidence regarding the sale of its albums to demonstrate widespread dissemination such that these third party companies could have copied Plaintiff's Titles.

As a whole, the evidence regarding access is paltry and confusing.  As access has not been proven through either direct or circumstantial evidence, Plaintiff must show a <u>striking</u> similarity between the allegedly infringed work and KRB's product, rather than the lower <u>substantially</u> similar standard.


b.    **Substantial Similarity**

Generally, the plaintiff must show that there is substantial similarity between defendant's work and the allegedly infringed work.  The Sixth Circuit has adopted a two-part test to determine whether the defendant's work is "substantially similar" to plaintiff's work.  "Simply

_____

Catalogue."  The Springboard Catalogue does not contain the master recordings that were <u>produced</u> by Plaintiff and that are at issue in the present case.  Rather, the Springboard Catalogue is a set of master recordings that Plaintiff <u>obtained through agreement</u> from Koala Record Company.

-62-

because a work is copyrighted does not mean every element of that work is protected." <u>Boisson</u>, 273 F.3d at 268.

> [Therefore,] the <u>first</u> step 'requires identifying which aspects of the [plaintiff]'s work, if any, are protectible by copyright . . . . [T]he <u>second</u> [step] 'involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the [plaintiff]'s work. . . .

<u>Kohus</u>, 328 F.3d at 855 (citations omitted) (emphasis added). The Sixth Circuit has mandated that the inquiry in the second prong of the test must be made from the view point of the <u>intended</u> <u>audience</u>. <u>Id.</u> at 857. In most cases, the intended audience will be the lay public or the ordinary reasonable person, but sometimes it will include an audience that possesses a specialized expertise. <u>Id.</u> In the latter case, expert testimony is permissible to educate the trier of fact about the speciality. <u>Id.</u>

As explained above, due to the lack of evidence regarding access, the "quantum of similarity" required is "striking similarity." <u>Murray Hill</u>, 361 F.3d at 317. Striking similarity has been described as "similarities . . . [that are] so striking as to preclude the possibility that the defendant independently arrived at the same result. In other words, as a matter of logic, the only explanation for the similarities between the two works must be 'copying rather than . . . coincidence, independent creation, or prior common source.'" 4 <u>Nimmer on Copyright</u>, § 13.02[B], at 13-28.

Furthermore, the Sixth Circuit in has recently enunciated a new standard for analyzing copyright infringement of sound recordings. <u>See</u> <u>Bridgeport Music, Inc. v. Dimension Films</u>, 383 F.3d 390 (6th Cir. 2004), <u>republished on grant of panel reh'g</u>, 401 F.3d 647 (6th Cir. 2004), <u>amended on reh'g by</u> 410 F.3d 792 (6th Cir. 2005). The Sixth Circuit held that the "analysis that is appropriate for determining infringement of a musical composition copyright, is not the

-63-

analysis that is to be applied to determine infringement of a sound recording." <u>Dimension Films</u>,

410 F.3d at 798. Reading the Copyright Act literally, the Sixth Circuit stated:

> sound recording copyright holders [have] the <u>exclusive</u> right 'to duplicate the
> sound recording in the form of phonorecords or copies that directly or indirectly
> recapture the actual sounds fixed in the recording.' 17 U.S.C. § 114(b). This
> means that the world at large is free to imitate or simulate the creative work fixed
> in the recording so long as an actual copy of the sound recording itself is not
> made. If you cannot pirate the whole sound recording, can you 'lift' or 'sample'
> something less than the whole[?] Our answer to that question is in the negative.

<u>Id.</u> at 800 (emphasis added). In so stating, the Sixth Circuit rejected the substantial similarity

test, as well as de minimis taking, for sound recording infringement claims. <u>Id.</u> at 801. Thus, in

the context of sampling[15] in rap music, the Sixth Circuit held that any sampling of a sound

recording constitutes copyright infringement <u>per</u> <u>se</u>, regardless of whether the defendant's work

is substantially similar to the plaintiff's work, and regardless of whether the relevant audience

can identify the copied material. <u>Id.</u> at 800.

     With regard to the musical composition "Don't Fall Asleep at the Wheel," Plaintiff has

proven copying by a preponderance of the evidence under the strikingly similar standard.

Similarly, under the more stringent infringement standard for sound recordings enunciated by the

Sixth Circuit, Plaintiff has also proven copying of the twenty-one sound recordings. Stone

identified distinctive "footprints" and other characteristics, including distinct vocal or

instrumental performances, mistakes and sound effects that were present in KRB's product and

Plaintiff's master recordings. The Court found Stone to be a credible witness and adopted his

expert report. <u>See</u> <u>supra</u> Section I.G. Defendants offered no evidence, expert or otherwise, to

challenge Stone's conclusions.

---

    [15] "Sampling is the process by which previously recorded material is captured
electronically and reproduced in a new recording with or without alteration." Robert C.
Osterberg and Eric C. Osterberg, <u>Substantial Similarity in Copyright Law</u>, 9-12 (2005).

Defendants attempted to show that there were numerous re-recordings by the same artists regarding the same Titles in the market. Therefore, Defendants argued, KRB's product was not a copy of Plaintiff's product, but a copy of a third party's master recordings, such as K-Tel. Defendants did not present any comparison of Defendants' product to K-Tel or other third party master recordings to prove its point. Defendants argument, therefore, is conjecture upon which the Court cannot rely.

### B.     LIABILITY

Thus far, Plaintiff has proved ownership and copyright infringement of the Titles. The next issue is who must be held liable for this infringement and under what theory of infringement. There are several types of infringement: direct, contributory and vicarious infringement. Furthermore, an officer of a corporation may be held individually liable under corporate veil piercing law.

### 1.     Defendant KRB

KRB is a direct infringer. "Liability for direct infringement arises from the violation of any one of the exclusive rights of a copyright owner. 17 U.S.C. § 501(a). The owner of copyright in a musical composition [or sound recording] has the exclusive right to, and to authorize others to, reproduce [and] distribute . . . the copyrighted composition [or sound recording]. 17 U.S.C. §§ 106[, 114]." Bridgeport Music, Inc. v. Rhyme Syndicate Music, 376 F.3d 615, 621 (6th Cir. 2004). One can be a direct infringer even when one is unaware that he or she is selling product that infringes on another's copyright. See F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228 (1952); see also Rogers v. Koons, 777 F. Supp. 1

(S.D.N.Y. 1991), aff'd, 960 F.2d 301 (2d Cir.), cert. denied, 506 U.S. 934 (1992). In F.W. Woolworth Co., Woolworth purchased sculptures of cocker spaniel's from a third party. 344 U.S. at 229. "Unbeknown to Woolworth, these dogs had been copied from [plaintiff's]." Id. Notwithstanding Woolworth's lack of knowledge that the sculptures had been copied, the Supreme Court found them to be liable for direct infringement by the mere fact that they marketed and sold the sculptures.

KRB reproduced and distributed "Don't Fall Asleep at the Wheel," "Patches," and "When a Man Loves a Woman," pursuant to the Peachtree Agreement. KRB did so presuming it had a valid license from Peachtree to reproduce and distribute these Titles. KRB distributed the remaining nineteen Titles after purchasing finished product from Red Dog Express, Creative Sound and Golden Circle. KRB did not know that these third parties did not have the right to license or sell these Titles. Notwithstanding KRB's lack of knowledge, KRB is still directly liable for its reproduction and/or distribution of these Titles pursuant to 17 U.S.C. § 501(a). Id.


2.      *Defendant Bennett*

Plaintiff argues that Bennett should also be held individually liable for the copyright infringement of the twenty-two Titles under the theories of contributory and vicarious infringement. Defendants do not address this argument directly, but state that Bennett should not be held individually liable because Plaintiff has not proved facts sufficient to pierce the corporate veil.

It is important to

[n]ote the distinction between being liable as a related defendant and liability through various theories of corporate law. For instance, utter dominance of one corporation by another could lead to direct liability under an alter ego theory. By contrast, related defendants become liable indirectly, either via the . . . category of

-66-

corporate liability or through theories of vicarious liability, contributory infringement . . . .  The boundaries between these categories are fluid.  Nonetheless, the distinction between them should be drawn when possible.

3 Nimmer on Copyright, § 12.04[A][1], at 12-76.  In this case, the Court finds that Bennett is individually liable under the theory of vicarious infringement.[16]

"A defendant can be held vicariously liable if he enjoys a direct financial benefit from the infringing activity and 'has the right and ability to supervise' the infringing activity."  Rhyme Syndicate Music, 376 F.3d at 621.  Bennett was the primary decision maker for almost every aspect of KRB's business.  Importantly, at the time the Titles were purchased, Bennett decided which products were purchased from third parties and sold at Big Lots.  In addition, Bennett was the only corporate officer on behalf of KRB who was involved in the negotiations with Peachtree.  As a whole, Bennett was in charge of operating KRB, made all final decisions, and was ultimately responsible for anything that happened at KRB.  This is consistent with his position as sole shareholder and president of KRB.  As a result, he had the right and ability to supervise the infringing activity.  In addition, Bennett enjoys a direct financial benefit from the infringing activity because, as sole shareholder, he retains any profit produced by the company.  Consequently, Bennett is vicariously liable for KRB's copyright infringement of Plaintiff's Titles.

---

[16]  Plaintiff has not proven the factors required to pierce the corporate veil.  Similarly, Plaintiff has not shown the requisite knowledge for contributory infringement.  "Contributory infringement occurs when one, 'with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another.'"  Bridgeport Music, Inc. v. Rhyme Syndicate Music, 376 F.3d 615, 621 (6th Cir. 2004).  As the Court notes in its discussion of willful infringement, KRB did not have knowledge that it was engaging in infringing activity.  A fortiori, Bennett could not have known that he was engaging in infringing activity.  Thus, the contributory infringement avenue is precluded.

-67-

## C. **DAMAGES**

*1. Statutory Damages*

A copyright owner may elect to recover an award of statutory damages in lieu of actual damages and profits at any time before final judgment is rendered. 17 U.S.C. § 504(c)(1). The Copyright Act permits a minimum award of $750 and a maximum award of $30,000 for each copyrighted work infringed. Id. "District courts have wide discretion in setting damages within the statutory range set forth in § 504(c)(1)." Disney Enters., Inc. v. Farmer, -- F. Supp. 2d ---, 2006 WL 962577, at *6 (E.D. Tenn. Apr. 10, 2006). This statutory scheme is "'designed not solely to compensate the copyright owner for losses incurred, but also to deter future infringement.'" Johnson v. Jones, 149 F.3d 494, 504 (6th Cir. 1998) (quoting F.W. Woolworth Co., 344 U.S. at 233).

Liability for copyright infringement does not turn on the infringer's mental state because "a general claim for copyright infringement is fundamentally one founded on strict liability." Bridgeport Music Inc. v. 11C Music, 154 F. Supp. 2d 1330, 1335 (M.D. Tenn. 2001) (citation omitted). For purposes of damages, however, the infringer's mental state is important, as damages may be increased or decreased based on an infringer's knowledge of infringement. Thus, if the plaintiff proves that the infringement was willful, statutory damages may be awarded up to $150,000 per copyrighted work infringed. 17 U.S.C. § 504(c)(2). On the other hand, if the defendant proves that the infringement was innocent, the award may be reduced to $200. 17 U.S.C. § 504(2)(c).

"Willful" and "innocent" have specialized meanings under the Copyright Act. On the one hand, willful infringement means conduct that the defendant knows constitutes copyright infringement. "[O]ne who has been notified that his conduct constitutes copyright infringement,

-68-

but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes. But one who 'recklessly disregards' a copyright holder's rights, even if lacking actual knowledge of infringement, may be subject to enhanced damages."  4 <u>Nimmer on Copyright</u>, § 14.04[B][3][a], at 14-78-14-79, <u>quoted</u> in <u>Princeton Univ. Press v. Mich. Document Servs., Inc.</u>, 99 F.3d 1381, 1392 (6th Cir. 1996).[17]  On the other hand, the Copyright Act explains that innocent infringement occurs when "the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright."  17 U.S.C. § 504(c)(2).  To prove "innocent" infringement, the defendant has the burden of showing that he or she had a good faith belief that his or her infringing conduct did not amount to infringement, <u>and</u> that the good faith belief was reasonable.  4 <u>Nimmer on Copyright</u>, § 14.04[B][2][a], at 14-74.

> Courts may consider several factors in awarding statutory damages including:
>
> 'the expenses saved and profits reaped by the defendants in connection with the infringements, the revenues lost by the plaintiffs as a result of the defendants' conduct, and the infringers' state of mind whether willful, knowing, or merely innocent.'  In awarding statutory damages, courts may also consider 'the goal of discouraging wrongful conduct.' . . .  The option of electing statutory damages is especially appropriate where 'the information needed to establish an exact measure of actual damages is within the infringers' control and often is not fully disclosed.'

<u>Disney Enters., Inc.</u>, 2006 WL 962577, at *6 (citations omitted).  Plaintiff argues that an analysis of these factors demonstrates willful infringement because Defendants knew they were infringing or at least should have known and recklessly disregarded Plaintiff's intellectual property rights, warranting an increase in damages of up to $150,000 per copyrighted work infringed.

---

[17]  It is important to note that the new rule enunciated by the Sixth Circuit regarding copyright infringement of sound recordings does "not play any role in the assessment of concepts such as 'willful' or 'intentional' in cases that are currently before the courts or had their genesis before this decision was announced."  <u>Dimension Films</u>, 410 F.3d at 804-05.

### a.      Expenses Saved and Profits Reaped by Defendants

In this case, it is virtually impossible from the evidence presented to determine the expenses saved and the profits reaped by the Defendants in connection with the infringements. To begin with, Defendants have no record of purchasing, manufacturing or selling approximately eleven of the sound recordings in Count II.  With regard to two sound recordings ("Patches" and "When a Man Loves a Woman") Defendants' records show that 2,100 cassettes were manufactured, but Defendants do not have any sales records.  With regard to the remaining nine Titles, Defendants' records reveal they reproduced or purchased them from third parties and then sold to Big Lots as much as 5,977 or as little as 600 of each Title.  Using these figures, Defendants calculated that their net profit from the sale of the nine Titles is under $2,000.

Defendants raise numerous reasons for the low sales figures.  Defendants claim that cassette sales represented a small percentage of total sales for KRB and dollar cassette product represented an even smaller percentage of sales. Vice President of KRB, Patrick Hayes ("Hayes"), testified that other than seasonal promotions for Christmas or Halloween and the like, for the years 1999, 2000 and 2001, sales of cassette tapes represented less than twenty percent of KRB's sales.  No documentary evidence was presented to support Hayes' testimony.  Similarly, no evidence was presented regarding the percentage of cassette tape sales in the years prior to 1999.

Defendants contend that they could not provide more sales information regarding the twenty-two Titles because many of them were purchased as part of pre-packs or closeouts and individual song titles were not noted in their accounting system.  Defendants admitted that when buying miscellaneous closeout product from third parties, they would not necessarily know each

and every title that was received due to the small quantity of the product. This process, Defendants argue, explains why its records do not show sales of certain of the Titles.

In contrast, Plaintiff argues that the true sales figure is much higher because from 1999 to 2001, Defendants' average yearly gross sales were between $32,625,107 and $34,800,114. Defendants stated that sales of cassettes represented approximately 20% of its sales; therefore, average yearly gross sales of cassettes were between $6,525,021 and $6,960,022. Plaintiff asserts that there is no way to extrapolate how much of this amount relates to the Titles at issue. Plaintiff contends that contrary to Defendants' explanations, a more pernicious reason lies beneath the lack of sales records for the Titles. Plaintiff asserts that Defendants pre- and post-lawsuit conduct not only has precluded Plaintiff from showing Defendants' actual expenses and profits, but is also indicative of intentional copyright infringement warranting an increase in damages.

        i.       <u>Defendants' Pre-Lawsuit Conduct</u>

Plaintiff contends that Defendants intentionally have developed an accounting system that does not track which products have been bought or sold in order to hide illegal activity. Plaintiff goes one step further and alleges that Defendants, and almost all the third parties with whom they do business, have colluded to create a fraudulent accounting system that permits Defendants to reproduce and distribute illegal copies of music product.

The cast of characters involved in the alleged illegal scheme to conduct copyright infringement include KRB's lawyer, William Tucker ("Tucker"); Theresa Peitsmeyer ("Pietsmeyer"), a former KRB employee who now runs Requin, a company that manages KRB's accounting system, Navision; Robert Ciotti ("Ciotti"), the principal of Distributors Copyright

Maintenance Service ("DCMS"), which performed KRB's royalty accounting; KRB's external auditor, Greg Welch ("Welch"); Timothy O'Meara ("O'Meara"), the principal of Level Two, a warehouse company that stored KRB product that was received and distributed, and that received the cassette tapes returned by Big Lots. In essence, Plaintiff attacks almost anybody who had any contact with KRB as actively participating in a complex scheme to sell illegally copied music product to the public. There is little more than speculation to support Plaintiff's theory of deception.

### 1.    *Tucker*

Plaintiff argues that Tucker's lack of experience in intellectual property matters coupled with his minimal due diligence in drafting the Peachtree Agreement is evidence of fraud. Plaintiff contends that Tucker should have reviewed all the contracts by which Horner acquired the rights to the titles that were being licensed to KRB in the Peachtree Agreement. Tucker reviewed some eight to ten contracts, but relied on KRB to conduct the remaining due diligence. It is unclear whether these eight to ten contracts related to a number of recordings or whether each contract related only to a single recording. If these contracts related to numerous recordings, it is possible that Tucker reviewed the documents that related to most of the recordings Horner was conveying to Bennett through the Peachtree Agreement. The evidence is simply too murky for this Court to make any conclusion with certainty.

Next, Plaintiff asserts that Tucker should have been skeptical about Horner's willingness to license songs by popular artists for twenty-five years for $50,000. Plaintiff, however, did not present any evidence of how much a licensing agreement regarding re-recordings of older songs would normally be worth. Furthermore, KRB was responsible for paying mechanical licenses

and royalties pursuant to the Peachtree Agreement, which may have been a factor in negotiating the price. This Court, therefore, cannot say whether the purchase price was so unusually low to indicate fraud.

Lastly, Plaintiff points out that the Peachtree Agreement identified the first Classic Sound Lawsuit. Plaintiff asserts that the Peachtree Agreement included the same master recordings that were being litigated in the Classic Sound Lawsuit. As we have seen, that does not appear to be the case with two of the three Titles, "Don't Fall Asleep at the Wheel" and "When a Man Loves a Woman," that KRB obtained from the Peachtree Agreement. It is possible, but has not been proved with any degree of certainty, that the master recording for "Patches" may be the same in the Classic Sound Lawsuit and the Peachtree Agreement. In any event, Plaintiff chastises Tucker for not further researching the Classic Sound Lawsuit before and after the Peachtree Agreement was executed. Had Tucker performed further research into the Classic Sound Lawsuit, he would only have discovered that ownership of "Patches" was being contested. As there is no evidence that the master recording of "Patches" is the same in both the Classic Sound Lawsuit and the Peachtree Agreement, the Court cannot say with certainty that Tucker acted with reckless disregard of Plaintiff's copyrights of that sound recording.

Notwithstanding the Classic Sound Lawsuit, Horner specifically warranted in the Peachtree Agreement that no claims or legal actions existed to prevent the licensing of the recordings to KRB. While additional research may have revealed that this representation may not have been accurate, the failure to conduct additional research does not amount to intentional fraud. Furthermore, while these facts demonstrate that Tucker's and Bennett's actions were perhaps on the cusp of reckless disregard of the ownership of the recordings in the Peachtree Agreement, the Court is not satisfied that the evidence pushes them firmly over.

Finally, the Court notes that by the time the Classic Sound Lawsuit was settled in August 1999 in Plaintiff's favor, Lytle had already made vague accusations to Bennett that the latter was illegally exploiting Plaintiff's Titles that were allegedly involved in the Classic Sound Lawsuit. Lytle, however, did not inform Bennett of the settlement. Nor did Horner. Therefore, KRB did not have notice that the Classic Sound Lawsuit was settled in Plaintiff's favor.

### 2. *Pietsmeyer*

Plaintiff also makes vague allegations of wrongdoing by Pietsmeyer. First, Plaintiff repeatedly notes that Pietsmeyer's company, Requin Accounting, is paid approximately $492,000 a year to manage the Navision accounting software system. Plaintiff contends that running Navision is essentially a data entry service and that Requin does not even employ a certified public accountant. Plaintiff asserts that in light of Pietsmeyer's prior salary of $54,000 per year when she was a KRB employee, her income through Requin of $492,000 per year is a considerable jump and is evidence of fraudulent activity. There is not a shred of evidence to support this accusation. Plaintiff has presented no proof as to how Pietsmeyer and her company Requin can or have manipulated Navision to produce incorrect information. Similarly, there is no proof that the lack of an accountant employed at Requin leads to the integrity of the accounting information to be compromised. Finally, Plaintiff has no support for its contention that payment of $492,000 to Requin is unduly high. There is no evidence that the cost of operating Requin is so minimal that Pietsmeyer receives most of the $492,000 directly. Even if she did earn that much, Plaintiff has not demonstrated how the payment of a high salary leads to accounting fraud.

-74-

Plaintiff also argues that Pietsmeyer failed to produce relevant documents in violation of Plaintiff's subpoena. Plaintiff argues that when relevant documents are not produced, and the party with the documents resists production, the Court must make a negative inference that these documents would have been harmful to that party's case. Plaintiff already filed a motion to compel Pietsmeyer to produce the requested documents with a federal district court in Indiana. The district court denied the motion to compel. Having failed to win its motion to compel, Plaintiff cannot now make the argument that Pietsmeyer improperly resisted or failed to respond to Plaintiff's discovery requests.

### 3. *Ciotti*

Ciotti was in charge of obtaining mechanical licenses, but he failed to do so for the musical composition "Don't Fall Asleep at the Wheel." Defendants admit that Ciotti failed to obtain such a license. "Don't Fall Asleep at the Wheel" was released on a KRB cassette entitled "Truck Drivin' Son of a Gun" in 1996. The cassette included a total of ten songs. Prior to the release, Ciotti obtained a mechanical license with respect to one of the songs, but did not obtain mechanical licenses for the remaining nine. After the release, Ciotti obtained licenses for eight of the songs, but failed to obtain one for "Don't Fall Asleep at the Wheel." Ciotti testified that he searched with the Harry Fox Agency, all performance rights societies (ASCAP, BMI, SESAC), the Internet and various other sources. Even though Ciotti was unable to locate the publisher of the composition, he calculated the mechanical royalties at the statutory rate for all sales of "Don't Fall Asleep at the Wheel" so that KRB could pay the publisher once its identity was discovered. Such royalties amount to $988.54 from 1996 through June 30, 2000. Ciotti testified that it was standard industry practice to obtain licenses after the release of the product.

Plaintiff points to Ciotti's lack of knowledge concerning where the royalties were deposited or accrued as evidence that KRB was not actually accruing the royalties. This allegation is unsupported by any evidence. Ciotti himself was not required to pay royalties, KRB was. Further, Ciotti testified that he was only responsible for informing KRB how much they were required to pay in royalties. Other than these allegations regarding Ciotti, Plaintiff did not demonstrate that KRB did not accrue royalties.

Plaintiff further argues that "industry custom" of obtaining mechanical licenses post-release is not a defense to infringement. In <u>Cherry River Music Co. v. Simitar Entm't, Inc.</u>, 38 F. Supp. 2d 310, 318-20 (S.D.N.Y. 1999), the court stated that an alleged infringer could not rely on industry custom of obtaining mechanical licenses after the release of the album. Indeed, 17 U.S.C. § 115(b) is crystal clear that if a negotiated mechanical license is not obtained or notice of a compulsory mechanical license is not filed or served within thirty days after making, and before distributing the work, the making and distribution of the work is actionable as an act of infringement. While the industry custom of <u>obtaining</u> the mechanical license after the release is acceptable, <u>notice</u> of the request for the mechanical license must be served or filed within thirty days after making and before distributing the work. In this case, no notice was provided because Ciotti could not find the publisher of this particular recording of "Don't Fall Asleep at the Wheel."

Plaintiff asserts that as Defendants should have, at minimum, provided notice of an intent to seek a mechanical license before distributing "Don't Fall Asleep at the Wheel" and failed to do so, Defendants are liable for willful infringement. The statute, however, only says that such conduct is actionable infringement and does not require a finding of willful infringement. Similarly, this case is not like <u>Cherry</u>, in which the court found willful infringement. 38 F. Supp.

2d at 318-20.  In that case, the court, relying on expert testimony, found that although it may be

"industry custom" for a music publisher to grant mechanical licenses freely in order to maximize

their royalty revenues, such custom was inapplicable in that case because the co-copyright owner

was a non-music publisher.  Id.  That non-music publisher had a strong interest in denying

mechanical licenses because it manufactured and sold a compact disc that included the

copyrighted music at issue in the case.  Id.  Thus, a grant of a mechanical license to another party

could reduce sales of its own compact disc.  Id.

        In this case, there is evidence that the industry custom was to obtain a mechanical license

after the release of the product.  In fact, Defendants obtained a majority of the mechanical

licenses for the songs on "Truck Drivin' Son of a Gun" by Ferlin Husky, the cassette which

included "Don't Fall Asleep at the Wheel," after the release of the cassette.  None of the other

music publishers objected to the practice and freely granted the mechanical license post-release.

In contrast to Cherry, there is no evidence that Plaintiff continues to sell its album "Greatest Hits

of Ferlin Husky."  Indeed, the evidence would suggest that Plaintiff no longer sells this album, as

the copy that was provided to the Court is in the form of an LP, which in the current iPod

generation is obsolete.  Regardless, when Plaintiff met with Bennett in 1997 he indicated that he

wanted to conduct business with Bennett and KRB.  Therefore, unlike the plaintiff in Cherry, in

this case, the Plaintiff likely would have granted a mechanical license.  In conclusion, although

the Court does not condone this industry custom, and it is certainly not a defense to liability, the

Court declines to use it as evidence of willful infringement to increase damages.

### 4.      Welch

        Next in the line of attack is Welch, KRB's external auditor and a certified public

accountant.  Plaintiff contends that Welch did not perform an accurate audit and did little more

than check math based on documents provided by KRB.  The crux of Plaintiff's argument is that

Welch relied on documents provided by KRB in performing his audit and did not request certain

documents or information regarding royalty payments.  Plaintiff did not present any evidence to

demonstrate that Welch's audit was inconsistent with general auditing and accounting principles.

As a result, Plaintiff's accusations that Welch's audit was poorly performed, or worse, was in

violation of audit and accounting principles and practices are unsubstantiated.


### 5.    *O'Meara*

With regard to O'Meara, this Court is unable to fathom Plaintiff's underlying complaint.

Plaintiff implies that it is suspicious why O'Meara's company, Level Two prepared and

maintained accurate records related to the receiving and distributing of KRB products, but did

not have accurate records of the product returned by Big Lots.  Presumably Plaintiff is

complaining that by having inaccurate records regarding the returned product, O'Meara was

assisting KRB in obfuscating evidence regarding sales of the Titles at issue in this case.  No

evidence was presented at trial to support this suspicion.  On the contrary, Plaintiff's suspicion is

facially unreasonable as it is unclear why KRB would require O'Meara to painstakingly record

800,000 cassette tapes that could not be sold, as cassette tapes are – like LPs – obsolete.

Further, Plaintiff sought to rely on O'Meara's deposition at trial.  Defendants filed a

motion in limine to preclude Plaintiff's use of O'Meara's deposition based on the fact that

O'Meara was within this Court's subpoena power.  See Fed. R. Civ. P. 32(a)(3)(D) (permitting

use of deposition of non-party witness at trial in limited circumstances if witness is unavailable).

Plaintiff requests this Court to "presume" that O'Meara's testimony would have been harmful to

Defendants due to their motion in limine.  Plaintiff conveniently forgets that it resolved

Defendants motion in limine by agreement.  Moreover, Plaintiff did not follow the Federal Rules of Civil Procedure because it failed to subpoena O'Meara to testify at trial.  Therefore, it cannot now request any negative inference.

ii.    Defendants' Post-Lawsuit Conduct

Plaintiff argues that statutory damages and an increased award for willful infringement are warranted because Defendants' discovery conduct not only made it impossible to prove actual damages, but also reflects Defendants' state of mind as intentional infringers.  "Statutory damages [are] . . . appropriate . . . [when] the information needed to establish an exact measure of actual damages is within the infringers' control and often is not fully disclosed."  Microsoft Corp. v. Sellers, 411 F. Supp. 2d 913, 921 (E.D. Tenn. 2006), (citing Yurman Design, Inc. v. PAJ, Inc., 93 F. Supp. 2d 449, 462 (S.D.N.Y. 2000) ("Statutory damages have been made available to plaintiffs in infringement actions precisely because of the difficulties inherent in proving actual damages and profits, as well as to encourage vigorous enforcement of the copyright laws.")).

Plaintiff cites numerous instances of discovery conduct by Defendants as supportive of an increased award of damages.  Plaintiff contends that a higher award is required because Defendants:  (1) served misleading discovery responses regarding the time period Defendants reproduced and/or distributed the Titles at issue; (2) ignored orders from both the Court and the Magistrate Judge regarding the cassette inspection; (3) improperly redacted relevant information from documents that were produced; (4) destroyed relevant documents throughout the course of litigation; (5) refused to produce relevant and responsive information; and (6) offered a great deal of testimony at trial that contradicted deposition testimony.

With regard to the misleading discovery responses, the Magistrate Judge found:

> In response to the plaintiff's written discovery, the defendants had previously responded that, other than that specifically provided, the defendant had not dealt in the titles at issue in this case 'at any time.' It was not until the deposition of Mr. Bennett on July 15, 2002, that the plaintiff learned that 'at any time' did not mean 'at any time.' Unbeknownst to the plaintiff, 'at any time' meant from December 4, 1997 through February 11, 2000, the time period asserted by the plaintiff in its complaint during which the defendants allegedly infringed the plaintiff's copyrights. . . . Whether intentional or not, the defendants clearly misled the plaintiff.

(Doc. No. 76.) Similarly, the Magistrate Judge expressed frustration with Defendants' failure to timely commence the cassette inspection. (Doc. No. 113.) Nevertheless, the Magistrate Judge noted in considerable detail that although Plaintiff was misled by Defendants' discovery responses regarding sales information, Plaintiff had "not acted as diligently as it could have to schedule any necessary discovery." (Doc. No. 76 at 8.) Thus, the Magistrate Judge concluded that "both sides bear responsibility for the predicament in which Plaintiff finds itself . . . ." (Id. at 14.)

With regard to the delayed inspection, while primarily faulting Defendants, the Magistrate Judge did note logistical details delayed the inspection. (Doc. No. 113 at 6.) These details, the Magistrate Judge said, were not addressed adequately in the Court's order requiring the inspection. (Id.)

Therefore, like the Magistrate Judge, this Court does not find it appropriate to increase damages due to discovery obstacles which, primarily caused by Defendants, were exacerbated by the Plaintiff and the Court itself. The Court also notes that at the time of the cassette inspection

-80-

Defendants were changing counsel. While this does not excuse the delay, it eliminates Plaintiff's assertion of deliberate misconduct, further precluding an increase in damages.[18]

At this point, the Court finds it necessary to make some general remarks about discovery in this case. While Defendants could have been more forthcoming during discovery, the Court does not find that their discovery behavior indicates an intentional obfuscation of actual expenses and profit records. Discovery in this case was very contentious. However, Defendants were not the only ones who contributed to the contention. As the Magistrate Judge already noted, Plaintiff's did not conduct timely discovery. In addition, Plaintiff's current complaint about not receiving sales information is a repetition of the argument already made before the Magistrate Judge. (See Doc. No. 97 (noting that "plaintiff contends that the defendants have not produced accurate records of sales of the titles at issue in this case").) There, in response to Plaintiff's complaints, the Magistrate Judge gave the Plaintiff the opportunity to have an independent certified public accountant review Defendants' vendor files from April 4, 1997 to December 31, 1997. "Depending on the results of such a review, the Court indicated that it would consider expanding a subsequent review to post 1997 vendor files." (Id. at 3.) Plaintiff, however, declined to have an independent certified public accountant conduct the review of Defendants' 1997 vendor files. Plaintiff did so believing that "such review was unnecessary and would be unproductive because an independent [certified public accountant] would not be

---

[18] The remaining discovery issues raised by Plaintiff are dealt with in the contemporaneously issued Memorandum Order denying Rule 37 sanctions. For the reasons that the Court denies sanctions, it also declines to increase damages. Similarly, the Court finds no merit in Plaintiff's argument that Defendants offered a great deal of testimony at trial that contradicted deposition testimony. Other than for Bennett, Plaintiff's do not detail which deposition testimony conflicts with trial testimony to indicate Defendants' mendaciousness. With regard to Bennett's testimony, the Court does not find that it significantly differs from his deposition testimony.

familiar enough with the documents at issue to make meaningful findings . . . ." (Id. at 4-5.) Instead, Plaintiff sought the production of vendor files, as well as general ledgers or subledgers from 1997 to December 2002. (Id. at 4.) The Magistrate Judge denied Plaintiff's request finding that there was insufficient reason to amend its previous ruling to permit an independent review of 1997 vendor files, with the possibility of an expansion to post 1997 files. Having declined to use the opportunity the Magistrate Judge provided, Plaintiff cannot now complain that the information needed to establish actual damages was within the infringers' control and not fully disclosed. The Magistrate Judge gave Plaintiff every opportunity to discover information relating to sales.

Further, Plaintiff makes a general complaint that third parties related to Defendants did not produce relevant documents that they acknowledged existed. Although it is clear that Plaintiff was not satisfied with the documents these third parties produced, except for Pietsmeyer, Plaintiff did not file a motion to compel production of the documents. As already noted, Plaintiff's motion to compel Pietsmeyer to produce documents was denied. Furthermore, Plaintiff has not explained how additional documents by other third parties would have assisted Plaintiff's calculation of actual damages. For these reasons, Plaintiff's complaints are now untimely and unfounded.

Finally, the Court notes that Plaintiff also resisted discovery and engaged in inappropriate litigation conduct. Plaintiff did not permit Defendants to inspect the sixteen-track master recordings until ordered to by Judge Echols. (Doc. No. 176). Most egregious in this Court's view is the fact that Plaintiff conducted extremely broad discovery regarding sixty-two titles, then during opening arguments without any prior notice to the Court or to Defendants, Plaintiff sought to dismiss without prejudice fully two-thirds of the titles from the lawsuit. In sum, both

sides were at fault for the discovery disputes and the Court declines to make a finding that produces a windfall for Plaintiff just because its conduct was "slightly" better than that of Defendants.

### b.        Revenues Lost by Plaintiff or Harm to Plaintiff

Next in the analysis of statutory damages is whether Plaintiff can show that it lost revenue as a result of, or was harmed by, Defendants' sales. Plaintiff argues that because Plaintiff did not know how many copies of the Titles Defendants sold, Plaintiff cannot show lost revenue. Nevertheless, Plaintiff did not make any showing of lost revenue, even with the information it did have. Nor did Plaintiff explain how it was harmed. Plaintiff stated that KRB product was inferior and would deter consumers from purchasing legitimate King product. Plaintiff, however, did not present any evidence that it continues to sell its albums containing the Titles. Indeed, as already noted, the evidence appears to show the contrary. Plaintiff submitted its albums in the form of obsolete LPs suggesting that it no longer sells these albums. Therefore, there was no evidence that the sale of Defendants' product reduced sales of Plaintiff's product. Further, there is no way that a consumer could tell that the inferior KRB product was actually Plaintiff's product. Thus, it is unlikely that a consumer would not purchase Plaintiff's product (if it is still available to the public) because it had previously purchased KRB's product and did not like it. Moreover, Lytle testified that he had never granted a mechanical license for these sound recordings in the past. Lytle did not say that he would have required a compulsory mechanical license as opposed to a negotiated license. Thus, it is unclear whether Plaintiff would have earned the statutory rate if Defendants had obtained a mechanical license. The only concrete harm Plaintiff has shown is the cost of litigating this lawsuit.

### c. Defendants' State of Mind

Knowledge that one is infringing on, or reckless disregard of, another's intellectual property rights constitutes willful infringement and warrants increased damages. Notice that one is infringing on another's product is persuasive evidence of willful infringement. Video Views, Inc. v. Studio 21, Ltd., 925 F.2d 1010, 1021 (7th Cir. 1991), overruled on other grounds by Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994); Chi-Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1227-28 (7th Cir. 1991). When the "infringer is provided oral or written notice of its infringing conduct by the copyright owner, yet 'pass[es] the matter off as a nuisance[,]'" the court may find willful infringement. Video Views, Inc., 925 F.2d at 1021. In other words, "one who undertakes a course of infringing conduct may neither sneer in the face of the copyright owner nor hide its head in the sand like an ostrich." Id.; see also Chi-Boy Music, 930 F.2d at 1227.

In Video Views, Inc., the Court considered the exact issue that is present in this case: the quality of the notice. 925 F.2d at 1021. In that case, the plaintiff notified the defendant in writing of plaintiff's rights in some of the films involved in the lawsuit. Id. However, the two films that were found to have been infringed were not specifically listed in the letter. Id. Based primarily on this lack of specificity in the notice letter the Seventh Circuit affirmed the district court's decision that the infringement of the two films was not willful. In contrast, in Chi-Boy Music, the Seventh Circuit affirmed the district court's finding of willful infringement because the letter provided specific notice of infringement. Chi-Boy Music, 930 F.2d at 1227.

i.    <u>Pre-Lawsuit Notice</u>

In the present case, Plaintiff argues that Lytle informed Bennett numerous times that KRB was infringing Plaintiff's Titles, but Defendants continued to reproduce and distribute the Titles. Plaintiff contends that Lytle's conversation and letters with Bennett constitute sufficient notice to warrant a finding of willful infringement. The Court disagrees.

In the 1997 meeting, Lytle made vague accusations to Bennett of infringement. At the time, Lytle confined his allegations of infringement to the Classic Sound catalogue, which apparently included the same titles as those in the Peachtree Agreement. Nevertheless, Lytle did not provide Bennett with any <u>specific</u> titles that he believed were being infringed.

This oral notice was followed by a written letter, dated February 3, 1998. The letter did not clarify matters. Instead, Lytle simply made the broad allegation that KRB was "handling bootleg copies of G.M.L./Gusto's masters." By the time he wrote the letter, Lytle had already purchased all of KRB's product that is at issue in this case. Nevertheless, Lytle did not furnish Bennett with a list of the allegedly infringing product or any evidence to prove his ownership of the Titles. Bennett, in turn, did not simply ignore the letter, but responded in writing. Bennett stated that Lytle's oral concerns "never reached a specific statement . . . of any particular violation." Bennett also pointed out that Lytle's letter did not "raise any specific issue." Bennett legitimately stated that he could not provide a further response without additional, specific information. Although Lytle had bought all of the allegedly infringing KRB product at this point, and knew which titles he believed Bennett was infringing, he did not respond to Bennett's request. As a result, the quality of the notice was so poor that Bennett could not know which of Plaintiff's Titles he was allegedly infringing.

Importantly, even if this Court were to find that Lytle's allusion to the Classic Sound catalogue provided Bennett with sufficient notice of infringement, such notice would potentially only extend to "Don't Fall Asleep at the Wheel," "When a Man Loves a Woman," and "Patches," which Bennett obtained from the Peachtree Agreement. There is absolutely no notice -- not even vague notice -- from Lytle that the other nineteen sound recordings were being infringed.

Plaintiff further contends that Bennett was on notice, or at least should have known, that he was infringing on Plaintiff's copyrights because he was aware of the Classic Sound Lawsuit. There is no doubt that Bennett knew of the Classic Sound Lawsuit, but he did not know and could not have known, that Horner's claim to ownership of the titles in the Peachtree Agreement was invalid because the lawsuit was not settled until August 1999. Even then, neither Lytle nor Horner informed Bennett of the settlement. Thus, Bennett's view that Lytle was attempting to use him as a "pawn" in the litigation and was not making a legitimate claim of ownership was reasonable. Even if, as Plaintiff asserts, Bennett should have conducted further research with Horner to determine the ownership status of the titles in the Peachtree Agreement, it is not clear that Bennett would have received an honest answer from Horner. Also, as the Court has already noted, the Classic Sound Lawsuit would only have revealed an issue of ownership over "Patches" because "Don't Fall Asleep at the Wheel" was not a part of that lawsuit or the subsequent Classic Sound lawsuits, and the recording for "When a Man Loves a Woman" was a David Johnson recording, not Plaintiff's.

There is no evidence that Defendants knew or should have known that Red Dog Express, Creative Sounds or Golden Circle were illegally selling Plaintiff's Titles. Defendants were aware that the principals of these companies were not particularly reliable, but that is not

-86-

sufficient to demonstrate that Defendants should have known Red Dog Express, Creative Sounds or Golden Circle were selling illegal product.

In a similar case, the Ninth Circuit held that the fact that Defendants should have known that they did not have clear title to certain master tapes did not compel a finding of willful infringement. Grateful Dead Prods., Inc. v. Auditory Odyssey, No. 94-56258, 1996 WL 19210, at *1-2 (9th Cir. Jan. 18, 1996). In this case, while Defendants could have been more diligent in purchasing music product from third parties, and they perhaps should have known that the Peachtree Agreement was "too good to be true," the Court finds that their actions amount to negligence and nothing more.

Looking at the facts as a whole, the Court does not find that there is sufficient notice to constitute willful infringement.

ii.      Post-Lawsuit Notice

Plaintiff also suggests that KRB continued to sell the Titles after the filing of the Complaint. To support this suggestion, Plaintiff points to the fact that it found small quantities of six of the sound recordings during the inspection of the cassettes returned from Big Lots in 2002. The presence of the six sound recordings in returned product, argues Plaintiff, indicates that these sound recordings continued to be sold two years after the initiation of the lawsuits and two years after KRB received explicit notice that it was allegedly infringing Plaintiff's copyrights. The evidence presented suggests otherwise.

As soon as the Complaint was filed, Bennett and his employees issued "freeze" memoranda informing all employees to stop purchasing and selling the titles identified in the Complaint. These memoranda included a freeze of the titles identified in the Complaint in the

Navision system. Similarly, KRB informed its independent service representatives that serviced the music racks in the Big Lots stores to remove the titles identified in the Complaint from the display racks. The only evidence that these instructions were disobeyed or ignored is the presence of the Titles in the cassette inspection.

Plaintiff had sixty days in which to inspect 800,000 cassettes. Plaintiff complained numerous times to this Court that Defendants were delaying the cassette inspection. Nevertheless, once it began the inspection, Plaintiff did not utilize the entire time provided, and satisfied itself with a fifteen-day inspection. During these fifteen days, Plaintiff inspected approximately ten percent of the cassettes or approximately 80,000 cassettes and found very small quantities of six sound recordings at issue in this case. Plaintiff found one cassette of each of the following Titles: "Ain't Got No Home" by Clarence Henry, "The Mountain's High" by Dick & Dee Dee, and "Venus in Blue Jeans" by Jimmy Clanton; three cassettes of "The Coasters" by Charlie Brown; eight cassettes of "Bottle of Wine" by Jimmy Gilmer; and seventy-four cassettes of "Keep Searchin'" by Del Shannon. Plaintiff did not find any other Titles at issue in the present lawsuit.

Plaintiff wants this Court to assume that the presence of de minimis amounts of infringing material is evidence of post-lawsuit sales. Defendants, however, argue that these small amounts were bound to be in the returned product because notwithstanding their instructions, some cassettes were not going to be removed from the racks or Big Lots did not send the cassettes back when the service representatives removed the cassettes from the racks. The Court finds Defendants' explanation more plausible. Due to the fact that there were 1,300 Big Lots stores, a large number of service representatives involved and sixty-two titles initially identified in the Complaint, it is entirely possible, indeed probable, that 100% of the allegedly

infringing KRB product identified in the Complaint was not removed from Big Lots stores. Defendants also pointed out that certain of the cassettes returned by Big Lots were several years old, suggesting that Defendants had not supplied them to Big Lots recently. Other than cassettes found in the inspection, there is no other evidence to support Plaintiff's argument that Defendants continued to sell product bearing titles identified in the Complaint.[19]

### d.   Goal of Discouraging Wrongful Conduct

Finally, in awarding statutory damages, the Court may also consider "the goal of discouraging wrongful conduct." Disney Enters., Inc., 2006 WL 962577, at *6. In this case, Defendants have been in business for seventeen years. Unlike Plaintiff, there is no evidence that Defendants have been involved in any copyright infringement lawsuits other than the present one. Similarly, Defendants have sold 15,000 titles in the past. This lawsuit began with sixty-two titles and now only relates to twenty-two titles; a very small percentage of the Defendants' product. Moreover, Plaintiff essentially admitted that the real culprits in this case are the third parties from which Defendants obtained Plaintiff's Titles. These third parties are the ones who misrepresented their ownership in the Titles to Defendants. While this does not diminish Defendants' liability, it does bear favorably for Defendants in the damages analysis.

### e.   Amount of Statutory Damages Award

---

[19] Plaintiff argues that the only other evidence that would reveal post-Complaint sales are the matrices. However, as the matrices were destroyed during the lawsuit, Plaintiff could not present any proof of post-Complaint sales. This argument is unavailing for the reasons set forth in the contemporaneously filed Memorandum Order denying Plaintiff's sanctions motion, among other things.

In conclusion, there is very little evidence regarding Defendants' expenses and profits and Plaintiff's loss of revenue or harm. This is partly due to Defendants' recalcitrance during discovery in providing sales figures, although the Court also notes that Plaintiff's had an opportunity to obtain actual damages figures through a review of Defendants' vendor files by an independent certified public accountant. Moreover, the Court finds that Defendants did not have knowledge that they were infringing on Plaintiff's copyrights. Keeping in mind the lack of actual damages information, the lack of willful infringement, the parties' discovery conduct and the goal of discouraging future infringement, the Court finds it appropriate to impose damages of $10,000 per copyrighted work infringed. For the reasons already outlined, the Court declines to impose the maximum statutory award or impose any increased damages for willfulness.

2. *Copyrighted "Work"*

The next question is what constitutes a copyrighted work because "for the purpose of computing statutory damages, the relevant unit is not the number of infringements but the number of infringed 'works.'" UMG Recordings, Inc. v. MP3.Com, Inc., 109 F. Supp. 2d 223, 225 (S.D.N.Y. 2000). Plaintiff argues that each musical composition and sound recording is a separate copyrighted work. Therefore, Plaintiff seeks statutory damages for each of the twenty-two Titles at issue in this case. The caselaw does not support Plaintiff's request.

The House Report discussing statutory damages states: "Where the suit involves infringement of more than one separate and independent work, minimum statutory damages for each work must be awarded." See H.R. Rep. No. 94-1476, 2d Sess. at 162 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5778 (emphasis added). While the Copyright Act does not define the term "work," the Copyright Act considers "all the parts of a compilation . . . [to] constitute one

work[,]" even if the constituent parts of the compilation are copyrightable in their own right.  See 17 U.S.C. § 504(c)(1); see also 4 Nimmer on Copyright, §14.04[E][1], at 14-91 (noting that "[t]his result clearly follows if there is but a single copyright owner of all of the 'parts.'").  The House Report "makes clear . . . that, although they are regarded as independent works for other purposes, 'all the parts of a compilation or derivative work constitute one work'" for purposes of determining an award of statutory damages.  See H.R. Rep. No. 94-1476, 2d Sess. at 162, reprinted in 1976 U.S.C.C.A.N. at 5778.

UMG Recordings, Inc. addressed the same situation this Court faces.  In that case, the court found that the defendant had copied compact discs containing multiple songs.  109 F. Supp. 2d at 25.  Each compact disc containing the multiple songs was registered as a compilation on a single registration.  Id.  As the songs were registered as a compilation, the court, pursuant to the congressional mandate, awarded a single statutory damage award per compilation.  In doing so, the Court explicitly declined to grant an award per song.  Id.; see also Teevee Toons, Inc. v. MP3.Com., Inc. 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001) ("[T]he Court [in UMG Recordings, Inc.] held that the statute precluded an individual plaintiff who owned the copyrights on both the individual sound recordings that made up each of the CDs in issue and the compilation that comprised the CD itself from recovering more than a single award of statutory damages per CD.").

The Fourth Circuit came to a similar conclusion in Xoom.  The issue addressed in Xoom was whether a plaintiff could obtain an award for the compilation, as well as an award for the underlying preexisting works contained therein in which plaintiff also owned the copyright.  323 F.3d at 285.  The court answered in the negative stating that § 504(c)(1) only permitted one award because plaintiff's registration of the infringed product covered the product in its entirety

and the underlying preexisting works contained therein.  Id.  Thus, the court concluded that a plaintiff holding a copyright in a compilation could only receive one award of statutory damages for copyright infringement of that compilation.  Id.

In contrast, the First Circuit has noted:

> Under regulations promulgated by the Copyright Office, the copyrights in multiple works may be registered on a single form, and thus considered one work for purposes of registration, see 37 C.F.R. § 202.3(b)(3)(A), while still qualifying as separate "works" for purposes of awarding statutory damages.  We are unable to find any language in either the statute or the corresponding regulations that precludes a copyright owner from registering the copyrights in multiple works on a single registration form while still collecting an award of statutory damages for the infringement of each work's copyright.

Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1117 (1st Cir. 1993).  Following this logic, the First Circuit held that four episodes of a twenty-four episode television series registered on a single form constituted four separate "works."  Id.  Thus, infringement of the four episodes warranted four awards of statutory damages.  Id. at 1117-18; see CoStar Group Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 709-12 (D. Md. 2001), aff'd 373 F.3d 544 (4th Cir. 2004) (noting that critical fact in deciding whether one or multiple awards of statutory damages should be awarded depends on whether registration is of multiple works on a single form or of a compilation).

In order to register multiple works on a single form, however, the copyright claimant must clearly identify each work being registered.  In CoStar Group Inc., the plaintiff argued that it should receive multiple awards, one for each photograph infringed.  164 F. Supp. 2d at 711. The district court declined to do so finding that the photographs were not separate works registered on a single form, but instead were compilations.  Id. at 711-12.  The determining factor in the court's decision was the fact that the photographs were not individually identified on each application.  Id.  Rather, the registration simply identified the material to be copyrighted

-92-

as "photographs." Id. The court stated that the "bare reference to 'photographs' only has the efficacy as a description of the work to be copyrighted if it was made with reference to the other elements being copyrighted -- the compilation." Id.

In the present case, there are seventeen copyright registrations for the twenty-two Titles at issue in the case. This is because the three Ferlin Husky sound recordings -- "Gone," "Wings of a Dove," and "Fallen Star" -- were registered with the Copyright Office on a single registration under the title "Favorites of Ferlin Husky," with the catalogue number SD-3018. Similarly, the four Mary Wells sound recordings -- "My Guy," "The One Who Really Loves You," "You Beat Me to the Punch," and "Two Lovers" -- were registered with the Copyright Office on a single registration under the title "Dobie Gray and Mary Wells . . Greatest Hits," with the catalogue number PO 313.

There is no doubt that these registrations constitute compilations and not registrations of separate works on a single form. First, Plaintiff concedes that it registered these songs as compilations. Second, the individual sound recordings are not listed on the registrations. The registration lists the title of the albums and the fact that the registration covers sound recordings, but does not list the individual sound recordings. The fact that the label copy deposited with the Copyright Office identifies the individual sound recordings does not change the registration from a compilation to that of multiple separate works on a single form. Third, the Court notes that this case strongly resembles UMG Recordings, Inc. in which the court found that registration of an album constitutes a registration of a compilation even though it contains multiple sound recordings that can be registered separately. 109 F. Supp. 2d at 224-25. Thus, the Court holds that these two registrations are compilation registrations and a separate statutory award is not

warranted for each sound recording contained therein.[20]  As seventeen "works" containing the twenty-one sound recordings have been infringed, the Plaintiff is awarded $10,000 per work for a total of $170,000.


3.     *Statute of Limitations*

Defendants argue that the statute of limitations bars recovery of damages which accrued more than three years before April 3, 2000, the date of the filing of this lawsuit.  The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  Generally, courts have permitted a civil action as long as one instance of infringement occurs within the three year statutory period.  See Bridgeport Music, Inc. v. Chrysalis Songs, No. 3:01-0701 (M.D. Tenn. Dec. 2, 2002) (Higgins J.) ("A claim for copyright infringement . . . accrues at the time that the infringement upon which the suit is based occurred.  If such infringement occurred within three years prior to the filing, the action will not be barred even if prior infringements by the same party as to the same work are barred because they occurred more than three years previously.") The law is murkier, however, as to whether a plaintiff can recover damages on both the infringement that occurred within the statutory period and infringements that occurred three

---

    [20]  Other than the registrations for "Don't Fall Asleep at the Wheel," "Fraulein," "Amazing Grace," and possibly "Take This Job and Shove It," it appears to the Court that the remaining registrations are also compilation registrations.  Nevertheless, it is unnecessary for the Court to decide the status of the remaining registrations because only one sound recording on each of them has been infringed in this lawsuit.  Thus, whether the registrations are considered compilations and a constituent part has been infringed, or the registrations are that of separate works and one work on each registration has been infringed, the result is the same:  one statutory award for each.

years prior to the commencement of the action.  See 3 Nimmer on Copyright, § 12.05[A], at 12-148.8-12-148.10.

In the present case, it is clear that one instance of infringement occurred during the statutory period because KRB, through Big Lots, offered the Titles for sale and Lytle purchased each of the twenty-two Titles at issue during a period spanning from December 1997 to February 1998.  As this action could have been commenced at any time before December 2000, by commencing it in April 2000, Plaintiff was well within the statutory period.  The sole issue, therefore, is the extent of damages the Plaintiff can recover.  Had Plaintiff sought actual damages, the statute of limitations would have been an issue.  Under an actual damages analysis, the Court would have been required to decide whether Plaintiff could recover for infringements occurring three years prior to the commencement of this lawsuit.  Plaintiff, however, sought to recover statutory damages instead of actual damages.  Therefore, it is irrelevant how many instances of actual infringement occurred.  It is sufficient that one instance of infringement occurred during the statutory period.  As one instance of infringement did occur during the statutory period, Plaintiff is entitled to statutory damages.

In any event, Judge Echols already ruled that the statute of limitations should be equitably tolled.  (See Doc. No. 82.)  Judge Echols noted that there are five factors to consider when determining the appropriateness of equitably tolling a statute of limitations period.  (See id. at 6.)  One of the most important factors is plaintiff's lack of notice or lack of constructive knowledge of the filing requirement.  (Id.)  In considering plaintiff's notice, the court must review the plaintiff's reasonableness in remaining ignorant of the legal requirement for filing his or her claim.  (Id.)  Judge Echols found that Plaintiff had no knowledge and was not chargeable with any knowledge of Defendants' alleged copyright infringement until December 1997.  (Id. at

8.)  Similarly, he found that "Plaintiff was totally reasonable in its ignorance of the legal need to file a claim prior to December 1997."  (Id.)

Defendants challenged Judge Echols' ruling immediately after it was issued and requested that he reconsider.  (Doc. No. 84.)  Defendants argued that contrary to Judge Echols' ruling, equitable tolling is inappropriate in this case because Plaintiff did have knowledge of the infringing activity more than three years prior to the commencement of the lawsuit.  Defendants point to Lytle's February 3, 1998 letter to KRB in which Lytle stated:

> I have had people check your Big Lot stores that you rack and continue to find illegal copies of my masters that apparently you are selling to them.  As time goes on, there seems to be more.
>
> I have told you on the phone two or three times over the past year and a half.  I tried to talk to you in my office about the situation and you got very defensive.  I should have known, when you refused to let me see and copy a Classic Sound catalog that you had, that you had no intentions of trying to stop handling bootleg copies of G.M.L./Gusto's masters.

From the letter, it is entirely unclear what exactly Lytle communicated to Bennett "on the phone two or three times over the past year and a half."  The inference is that Lytle told Bennett that KRB was allegedly illegally exploiting Plaintiff's product.  According to the letter, these telephone conversations occurred a year-and-a-half prior to the letter, i.e. in mid-1996.  Judge Echols' denied the motion to reconsider stating "[w]hile this letter is evidence that Plaintiff may have been aware of the alleged infringing conduct more than three years prior to filing its Complaint, this is an issue of fact to be determined [at trial]."  (Doc. No. 100 at 2) (emphasis added).

Other than this letter, there is no evidence that Plaintiff was aware of the infringement since mid-1996.  At trial, Bennett testified that Lytle had contacted him telephonically once, but could not recall the date of the phone call.  Moreover, Bennett did not testify about any details of

-96-

the call.  Therefore, it is unclear if Lytle accused him of infringement at that time.  Similarly, Lytle testified that he "talked to [Bennett] on a few occasions on the phone and after I went out to the stores and seen myself that he was copying my tapes and selling them, I set up a meeting for him to come to my office, which he agreed to do."  Lytle did not testify when the phone calls occurred or what he said to Bennett, although his testimony implies that he alluded to KRB's copyright infringement of Plaintiff's Titles.  Lytle, however, also testified that in his early contact with Bennett, Lytle was trying to convince Bennett to purchase music product from Lytle and his companies.  Thus, it is possible that the phone calls did not involve allegations of infringement.

In any event, it appears that until December 1997, when Lytle first purchased cassettes from Big Lots, Lytle himself did not know whether KRB was infringing on Plaintiff's Titles.  Instead, Lytle had a vague notion that KRB may be infringing on his company's product.  Just as this Court has already concluded that this February 3, 1998 letter was too vague to give Bennett notice of infringement, the Court also finds that it is ambiguous about what Lytle knew about the alleged infringement and when he knew it.  The Court finds that Lytle's "suspicions" of infringement that "possibly" dated back to mid-1996 are too conjectural to hold that Lytle had the requisite knowledge to preclude the tolling of the statute of limitations.  In sum, there is insufficient evidence to overturn Judge Echols' prior factual and legal determination that the statute of limitations should be equitably tolled, and the Court declines to do so.  The statute of limitations does not prevent Plaintiff from obtaining an award of statutory damages per copyrighted work infringed.

### D.   <u>ATTORNEY FEES</u>

Plaintiff requests an award of attorney fees.  The Copyright Act provides that the district court may, in its discretion, award costs, including reasonable attorney fees, to the prevailing party.  17 U.S.C. § 505.  It is well-settled that a plaintiff will be considered a prevailing party "for attorney's fees purposes if [the plaintiff] succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit. . . ."  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983) (citations omitted).  As the Supreme Court teaches, awarding attorney fees to the prevailing party in copyright cases is <u>entirely within the Court's discretion</u>.  <u>Fogerty</u>, 510 U.S. at 533 (emphasis added).  While there "is no precise rule or formula for making" a decision regarding attorney fees, a district court is required to exercise "equitable discretion."  <u>Id.</u> at 534.  In doing so, the Supreme Court condoned the use of non-exclusive factors such as "frivolousness, motivation, objective unreasonableness (both factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  <u>Id.</u> at 534 n.19 (citations omitted).  These factors are to be applied with the purpose of the Copyright Act in mind.  <u>Id.</u>

In this case, even though the Court did not accept all the legal theories that Plaintiff propounded, it is clearly the prevailing party, as judgment is being entered in its favor and it is receiving monetary damages.  Nevertheless, the Court -- in its discretion -- declines to award attorney fees.  When this case commenced, it involved sixty-two titles.  On the first day of trial without explanation or notice to this Court or to the Defendants, Plaintiff requested the dismissal without prejudice of claims relating to forty of the titles in Count III.  Plaintiff conducted laborious and contentious discovery spanning three years.  Much of this discovery focused on the titles in Count III.  To grant attorney fees when Plaintiff dropped two-thirds of the case at the

beginning of trial would impermissibly condone Plaintiff's conduct. As the Magistrate Judge noted, Plaintiff did not conduct discovery in an efficient manner and the dismissal of Count III at the start of trial is indicative of Plaintiff's lack of preparation.

While the Court acknowledges that it is rare for a prevailing party to be denied attorney fees in a copyright case, it is certainly not a case of first impression. Indeed, the Sixth Circuit resoundingly affirmed a district court's denial of attorney fees due to both parties' discovery misconduct. See Ronald Mayotte & Assocs. v. MGC Bldg. Co., No. 97-1483, 1998 WL 385905, *1 (6th Cir. July 1, 1998) (finding that both "parties behaved so irresponsibly that the court was unable to calculate a reasonable fee.")


### III.    CONCLUSION

In sum, Defendants have **INFRINGED** Plaintiff's copyrights in the twenty-two Titles at issue in this case. Defendants are **JOINTLY** and **SEVERALLY LIABLE** for the infringement. **JUDGMENT IS ENTERED** in **FAVOR OF PLAINTIFF** and the Court **AWARDS** Plaintiff $10,000 for each copyrighted work infringed for a total of **$170,000**. The Court **DENIES** Plaintiff's request for attorney fees and both parties are to bear their own costs.


It is SO ORDERED.

Entered this the_____20th_____day of June, 2006.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT